# United States Court of Appeals
## For the First Circuit

No. 08-1406

LAWRENCE BUNCH, individually and on behalf of all others
similarly situated and on behalf of the W.R. Grace & Co.
Savings and Investment Plan; JERRY L. HOWARD, SR., individually
and on behalf of all others similarly situated and on behalf of
the W.R. Grace & Co. Savings and Investment Plan; DAVID MUELLER,
individually and on behalf of all others similarly situated and
on behalf of the W.R. Grace & Co. Savings and Investment Plan,

Plaintiffs, Appellants,

KERI EVANS, on behalf of herself and
a class of all others similarly situated,

Plaintiff,

v.

W.R. GRACE & CO.; W.R. GRACE INVESTMENT AND BENEFITS COMMITTEE;
ROBERT M. TAROLA; FRED E. FESTA; STATE STREET BANK AND TRUST
COMPANY; JOHN F. AKERS; RONALD C. CAMBRE; MARYE ANNE FOX;
OFFICER JOHN J. MURPHY; PAUL J. NORRIS; THOMAS A. VANDERSLICE;
H. FURLONG BALDWIN,

Defendants, Appellees,

BRENDA GOTTLIEB; W. BRIAN MCGOWAN; MICHAEL PIERGROSSI;
UNKNOWN FIDUCIARY DEFENDANTS 1-100; MARTIN HUNTER; REN LAPADARIO;
DAVID NAKASHIGE; ELYSE NAPOLI; EILEEN WALSH; FIDELITY
MANAGEMENT TRUST COMPANY; STATE STREET GLOBAL ADVISORS;
INVESTMENTS AND BENEFITS COMMITTEE; ADMINISTRATIVE COMMITTEE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Stahl, <u>Circuit Judges</u>,
and García-Gregory,[*] <u>District Judge</u>.

———————

Paul M. DeMarco, with whom <u>James R. Cummins</u>, <u>Terrence L. Goodman</u>, <u>Jane H. Walker</u>, and <u>Waite, Schneider, Bayless & Chesley Co., L.P.A.</u>, were on brief for plaintiffs-appellants.
Scott M. Flicker, with whom <u>Thomas A. Rust</u>, <u>Paul, Hastings, Janofsky & Walker LLP</u>, <u>Sean T. Carnathan</u>, and <u>O'Connor, Carnathan, Mack LLC</u>, were on brief for defendant-appellee State Street Bank and Trust Company.
Nancy S. Heermans, with whom <u>Carol Connor Cohen</u>, <u>Caroline Turner English</u>, <u>Valerie N. Webb</u>, and <u>Arent Fox LLP</u>, were on brief for defendants-appellees.

———————

January 29, 2009

———————

———————

[*]  Of the District of Puerto Rico, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This appeal is from a summary judgment granted by the district court dismissing consolidated suits[1] filed by various participants in the W. R. Grace Retirement and Savings Plan ("Plan").[2]  These actions allege breach of the fiduciary duty owed appellants pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").  29 U.S.C. §§ 1109, 1132.  Appellants sued their employer and retirement fund manager, W.R. Grace & Co. ("Grace"), as well as their delegated fiduciary, State Street Bank ("State Street").[3]  The latter was engaged by Grace to advise it regarding the soundness of retaining certain stock assets

---

[1]  Evans v. Akers, No. 04-11380 (D. Mass. filed June 17, 2004) and Bunch v. W.R. Grace & Co., No. 05-11602 (D. Mass. filed Aug. 2, 2005), consolidated into No. 04-11380 on May 18, 2006.  The procedural history prior to consolidation is long and complicated, and mostly irrelevant to the merits of this appeal.  Except where necessary, it will be by-passed for present purposes. See Bunch v. W.R. Grace & Co., 532 F. Supp. 2d 283 (D. Mass. 2008).

[2]  Certified as a class by the district court, comprising "all W.R. Grace Stock Plan participants and entities who owned shares of W.R. Grace's publicly traded common stock through the Grace Stock Plan at any time from April 14, 2003, through April 30, 2004." The class is represented in this case by Lawrence Bunch, Jerry L. Howard, Sr., David Mueller, and Keri Evans, hereinafter referred to collectively as "appellants".

[3]  In addition to Grace and State Street, individually named defendants included the W.R. Grace Investment and Benefits Committee, Robert M. Tarola, Fred E. Festa, John F. Akers, Ronald C. Cambre, Marye Anne Fox, Officer John J. Murphy, Paul J. Norris, Thomas A. Vanderslice, H. Furlong Baldwin, Brenda Gottlieb, W. Brian McGowan, Michel Piergrossi, Unknown Defendants 1-100, Martin Hunter, Ren Lapadario, Davis Nakashige, Elyse Napoli, Eileen Walsh, Fidelity Management Trust Company, State Street Global Advisors, Investments and Benefits Committee, and Administrative Committee. When appropriate they shall be included in the collective term "appellees".

of the Plan and to act independently on said advice. In synthesis, appellants claim that Grace and State Street breached their fiduciary duty to appellants when State Street sold the Plan's holdings in Grace stock at an imprudently low price while Grace was in bankruptcy reorganization. They claim that Grace failed to properly monitor State Street in the performance of its delegated fiduciary duties. Because we conclude that the granting of summary judgment in favor of appellees was appropriate as a matter of law, we affirm the decision of the district court.

## I. **Facts**[4]

Since at least 1976, Grace has sponsored the Plan, a defined contribution 401(k) plan which offers participants an opportunity to invest wages in anticipation of retirement benefits. The Plan was administered by the Investments and Benefits Committee ("IBC") composed of Grace officers. The IBC was responsible for selecting and changing investment options offered under the Plan. Each Plan member, however, had the power to determine in which fund to invest at any given time. The Plan offered participants twenty

---

[4] The parties stipulated to all the relevant facts, and thus the district court decided the matter as a case stated. Bunch, 532 F. Supp. 2d at 285. We follow this lead and recite the facts based principally on the recompilation contained in the decision of the district court. Id. at 285-86. These findings are binding upon us absent clear error. Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 108 (1st Cir. 2002) (on review of a case stated, the district court's factual findings and any inferences drawn from the stipulated facts are subject to review only for clear error). The district court's legal conclusions are, of course, subject to de novo review. Id.

-4-

eight different options, including the Grace Stock Fund, which invested in Grace stock. The Grace Stock Fund owned approximately 12% of Grace's outstanding shares.

Commencing in the 1970s, Grace, which was a global manufacturer and supplier of catalysts and silica products, became a defendant in industry-wide asbestos-related personal injury suits. Because of potential massive liability, on April 2, 2001, Grace filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the District of Delaware.[5]

In the meantime, from September 1999 until the bankruptcy proceedings were initiated in April 2001, the market price of Grace stock fell from approximately $19 per share to $1.50 per share. During this period, Grace continued to maintain the Grace Stock Fund and to offer Grace stock as an investment option in the Plan.[6] Thereafter, while the bankruptcy proceedings continued their course, and during the certified class period, the stock price more or less stabilized at between $2.00 to $5.00 per share.

On March 17, 2003, Brian McGowen, a member of the IBC, wrote the Plan's participants informing them that the Grace fiduciaries were "seriously consider[ing]" naming an independent

---

[5] See In re W.R. Grace, No. 01-01139 (Bankr. D. Del. filed April 2, 2001).

[6] As so happens, the failure to divest under those circumstances was itself the subject of a case before this court. See Evans v. Akers, 534 F.3d 65, 68 (1st Cir. 2008).

fiduciary to operate the Grace Stock Fund in order to avoid any potential conflict of interest arising out of the reorganization plan in Grace's bankruptcy. Thereafter, Grace proceeded to amend the Plan to allow the IBC to appoint an independent investment manager for the Grace Fund. The amendment provided that:

> [T]he Independent Investment Manager shall have the following authority and duties:
> . . .
>> (i) the continuous authority and duty to determine the extent that the continued retention of shares of Grace Stock within the Grace Stock Fund is not inconsistent with the applicable provisions of [ERISA], and to take actions in this regard that it deems appropriate; including the authority to dispose of Grace Stock held within the Grace Stock Fund and to close the Grace Stock Fund to participant trading.

Pursuant to this provision, in December 2003, after due deliberation, the IBC decided to resolve the potential conflict of interest conundrum by appointing State Street as an independent investment manager, granting it the powers and discretion authorized by the amended Plan. In this respect the independent investment manager was charged with determining the risks inherent in continued ownership of the Grace stock, including the extent of the contingent asbestos litigation liability, an analysis that was itself partially dependent on assessing the likelihood of enactment by Congress of the Fairness in Asbestos Injury Resolution Act of

-6-

2003. S. 1125, 108th Cong. (2003) (designed to provide economic relief to the litigation-ridden asbestos industry).

Upon its appointment, State Street itself proceeded to seek expert advice by retaining Duff and Phelps LLC ("D&P") for the purpose of obtaining an opinion regarding Grace's financial prospects, and the firm of Goodwin Procter LLP to provide appropriate legal counsel. After due consideration, D&P prepared a report that concluded that the value of Grace stock was between $0.73 and $3.02 per share, with a midpoint value of $1.88 per share. Considering that the approximate market price of Grace stock was $3.51 per share at that time, the State Street Fiduciary Committee ("Fiduciary Committee"), charged with exercising the discretion assigned to State Street by Grace, entertained D&P's findings and recommendations that the Grace stock be sold at its January 2004 meeting. The Fiduciary Committee, however, requested further findings.

Upon reconvening in February, the Fiduciary Committee concluded that the Grace stock was an inappropriate investment because of the risks inherent to the price of the stock by reason of the potential liability extant in the continuing asbestos litigation. Concomitantly, it also found that "the market price of W.R. Grace stock [was] not a good indication of its long term value." Thus, it decided that the best course to follow was to sell the Grace holdings on the open market.

Before doing so, however, State Street gave advance notice to Grace of its decision to begin selling the Plan's Grace stock. It then notified the Plan's participants of its decision, but advised them that, notwithstanding this decision, it would "continue to monitor the situation" and might decide to end the sales effort if the circumstances required it. The Grace fiduciaries did not question State Street about why it decided to sell the Plan's Grace stock, in part because Robert Tarola ("Tarola") considered such inquiry "off limits" in view of the conflict of interest potential that led to delegation of the independent power to act to State Street.

Relying in part on D&P's valuation of the stock, State Street proceeded to sell 13% of its Grace stock holdings at between $2.86 and $3.09 per share.

Approximately a month or two later, an independent third party investor, D.E. Shaw & Co.("Shaw"), sought to buy the Plan's remaining Grace stock. Shaw offered to buy this block at $3.50 per share, although the stock was then selling at $2.96 per share. State Street informed Grace of the offer and asked Tarola if there was anything that State Street should know about Grace before making a decision on this offer. Tarola responded that everything that State Street should know about Grace was available in the public domain.

On April 12, 2004, State Street sold substantially all of the Plan's holdings in Grace stock to Shaw at $3.50 per share, and notified the Plan participants of its action. The balance of the Grace stock was passed to Shaw one week later, on April 17, 2004.

## II. Discussion

Although packaged in a more legalistic wrapping, the essence of appellants' allegations of fiduciary misconduct by Grace can be reduced to faulting Grace for its failure or refusal to insert itself into State Street's decision-making process. This may be an accurate statement of Grace's actions, or rather inactions; however, under the circumstances of this case, this did not constitute a breach of Grace or State Street's fiduciary duties to appellants under ERISA.

### A. The Decision of the District Court

Before the district court, appellants argued that because Grace's stock traded in an efficient market,[7] absent evidence of eminent collapse of the stock price, State Street ought to have relied more heavily on market prediction of the stock's value, and "Grace's solid potential in the future," before deciding to sell

---

[7] The efficient market theory hypothesizes that the best indicator of a stock's potential, as well as its risks and liabilities, is the price at which it is traded in the open market. See In re Xcelera.com Sec. Litig., 430 F.3d 503, 508 (1st Cir. 2005) (discussing the efficient market theory in a securities case, and explaining that "'an efficient market is one in which the market price of the stock fully reflects all publicly available information.'" (quoting In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 14 (1st Cir. 2005))).

the Grace stock portfolio.  Bunch, 532 F. Supp. 2d at 287.  Rather than selling this stock, appellants contended that the efficient market theory established that the only action consistent with ERISA was the retention of the Grace stock.  Id.  Because the Grace stock was traded in an efficient market, placing a different price than the market price into the valuation process, as was done by State Street, constituted "second guessing" the market and thus, according to appellants, imprudent fiduciary conduct.  Appellees did not dispute that Grace stock traded in an efficient market but in contravention to appellants' position, Grace argued that the current market price of Grace stock constituted only one of the factors that a prudent fiduciary under ERISA needed to consider in deciding whether to retain or divest the stock from its portfolio.

The district court agreed that "the market was the best indicator of the stock's present value."  Id. (emphasis in original).  Nevertheless, it rejected appellants' notion that the efficient market was the standard by which the court should measure State Street's actions.  The court concluded that the applicable standard was ERISA's prudent person standard.  It ruled that ERISA did not require that a fiduciary maximize the value of investments, as Appellants seemed to imply by their arguments.  Rather, what ERISA calls for from a fiduciary is that it use the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

-10-

matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). As the district court aptly stated, "in common parlance, [what] ERISA fiduciaries owe participants [are] duties of prudence and loyalty," Bunch, 532 F. Supp. 2d at 288 (citing Moench v. Robertson, 62 F.3d 553, 561 (3d Cir. 1995)). The district court noted that other courts faced with allegations similar to those of appellants in this case had looked at the totality of the circumstances involved in the particular transaction. Id. Among the key decisions relied upon by the district court for reaching this conclusion was DiFelice v. U.S. Airways, Inc., in which that court stated:

> [W]e examine the totality of the circumstances, including, but not limited to: the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability.

497 F.3d 410, 418 (4th Cir. 2007).

Thus, the district court concluded, the relevant inquiry was not whether the market price was the best predictor of share value, as claimed by appellants, but whether State Street took into account all relevant information in carrying out its fiduciary duties under ERISA. Bunch, 532 F. Supp. 2d at 288. The district court then enumerated the various factors considered by State Street, in addition to the D&P report, in making its divestment decision, namely: the market price of the stock, information about

the Plan, the bankruptcy proceedings, the financial outlook of the company, and the potential liability by reason of the asbestos litigation.  State Street's analysis of these factors convinced the district court that there was a potential for loss of value of the Grace stock which was comparable to knowledge of an impending collapse, a conclusion which negated the presumption that retention of company stock was prudent under ERISA.  Id. at 289; see also Moench, 62 F.3d at 572.  In any event, as the district court noted, because the shares in question were sold at a higher price than the then-existing market price, the best that appellants could claim was that they could have earned more money had State Street not sold the Grace shares until a later date.  The district court ruled that the test was not whether the best possible action was taken by State Street, but whether it had considered all relevant factors at the time of the divestment decision.  Id. at 290.

Although appellants exert strenuous efforts to have us conclude otherwise, we can find little to disagree with in the decision of the district court.  We are nevertheless duty bound to consider appellants' contentions before us.

**B. The Case on Appeal**

On appeal appellants present us with two general complaints regarding the decision of the district court: first, they allege "misapplication" of the law concerning the presumption that the retention of company stock in a retirement plan is

consistent with ERISA, and second, they claim error in the district court's "mistaken" equation of State Street's process for deciding to sell the Grace stock, which the court said "took into consideration the totality of circumstances surrounding [said] stock," with a substantively sound and reasoned analysis of all relevant circumstances. Id. We shall discuss these contentions in inverse order of presentation because resolution of the second claimed error easily disposes of the first alleged fault.

Considering the thorough investigative and decisional process that preceded the divestment of the Grace stock by the fiduciaries in this case, it is difficult, indeed impossible, given the standard of review which we are bound to follow, to legally challenge their actions in this appeal. Notwithstanding the re-framing of the issues before us, as stated above, it is clear from a reading of appellants' briefs that they continue to base their contentions of breach of fiduciary duty by State Street on the mistaken application of the efficient market theory to the facts of this case, a contention that was rejected by the district court. Specifically, this contention is the erroneously framed argument that State Street breached its duty by not giving sufficient weight to the market price in determining the value of the Grace stock.

Reiterating what was decided by the district court, this position is plainly wrong. As cogently stated by that court, the efficient market is not the standard by which State Street's

actions are to be judged.  Rather, under ERISA, a fiduciary is required to act with "'the care, skill, prudence and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use.'" Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998) (quoting 29 U.S.C. § 1104(a)(1)(B)).  "[T]he test of prudence -- the Prudent Man Rule -- is one of conduct, and not a test of the result of performance of the investment."  Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983) (emphasis added) (quotation marks omitted). "[W]hether a fiduciary's actions are prudent cannot be measured in hindsight . . . ." DiFelice, 497 F.3d at 424.  The "test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917-18 (8th Cir. 1994) (quotation marks omitted).  Furthermore, prudence "involves a balancing of competing interests under conditions of uncertainty." Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 733 (7th Cir. 2006).  Rather than emphasizing one factor, the market price, as proposed by appellants, State Street correctly considered "the totality of the circumstances," including, of course, the market price of the Grace stock.  See DiFelice, 497 F.3d at 418; Keach v. U.S. Trust Co., 419 F.3d 626, 636-37 (7th Cir. 2005).

-14-

Under the circumstances of this case, the actions of both Grace and State Street, with relation to the divestment of the Grace stock held by the Plan, unquestionably meet the prudent man standard embodied in ERISA.

First of all, upon concluding that the decisions required of Grace management in connection with the reorganization proceedings augured a potential conflict of interest with Grace's fiduciary duties, Grace took the eminently correct decision of insulating itself from that possibility. It amended the Plan, after duly notifying the participants of its intended action and notifying them of the reasons for its action. It then delegated the relevant decisional power to an independent third party, State Street, to render its expert, unbiased assessment of the Grace stock, and to execute its autonomous determination based on its conclusion regarding whether the Fund's retention or sale of Grace stock was appropriate. See 29 U.S.C. § 1104(a)(1) (requiring a fiduciary to act "solely in the interest of the participants and beneficiaries"). State Street itself sought further assessment from two non-partisan professional entities, D&P and Goodwin Procter LLP, whose expertise in their respective fields of knowledge is not questioned by appellants.

State Street, as well as these two firms, in addition to closely monitoring the price fluctuations of the Grace stock on the market, compiled and studied Grace's financial performance and

-15-

outlook, in particular analyzing how developments in the Grace bankruptcy and the process of reorganization could impact the value of Grace's common stock. Of prime importance was whether Grace's contingent asbestos liabilities in the bankruptcy could approach or exceed the value of equity in the company, thus diluting or altogether wiping out the value of the Grace stock in the Plan's portfolio. Among the factors considered by the State Street team at the various meetings and conferences regarding the asbestos contingent liability were: (1) the asbestos-related bodily injury claims being filed and pending against Grace; (2) the outcome of class action litigation pending against Grace regarding a product called Zonolite attic insulation material; (3) the availability of insurance coverage to pay asbestos claims; and (4) the probability of passage of legislation pending in Congress, the Fairness in Asbestos Injury Resolution Act of 2003, which, if enacted, could reduce or cap Grace's liability for asbestos bodily injury claims.

Thereafter, based on its investigations and analysis of the facts that it found, D&P prepared and presented to State Street a detailed 88-page financial and valuation analysis of Grace, which included a determination of what it considered "a reasonable pricing range for the [Grace] stock given the factors we believe should impact the value to equity investors." Based on these factors, the recommendation was made to State Street to commence selling the Grace stock holdings. Nevertheless, the Fiduciary

-16-

Committee requested further analysis from its advisors, which led to additional meetings and a further formal presentation, attended by representatives of both D&P and Goodwin Procter LLP. At this presentation, a summary was made of the due diligence and analysis to date, which included the following summary of its recommendation:

> Unresolved asbestos litigation and potential asbestos legislation will affect the determination of whether Grace stock remains a prudent investment. The uncertainty and consequence of unfavorable events occurring as a result of litigation probabilities or of legislation not being enacted timely or at all, has resulted in the IFG[8] recommendation that the Committee override Plan documentation and begin to reduce the holdings of Grace stock.
>
> The recommendation to commence a selling program is based upon the IFG's determination that the continued holding by the Trust of all of its shares of Grace stock would be <u>imprudent and therefore inconsistent with the requirements of Section 404(a)(1)(B) of ERISA</u>. Such determination reflects the input of [D&P] and Goodwin [Procter LLP] and has been made after careful consideration of all of the facts and circumstances determined to be relevant by IFG.

(emphasis added).

Thereafter, the Fiduciary Committee met again and unanimously approved this recommendation, establishing as a minimum sales price the midpoint valuation range found by D&P of $1.88 per

---

[8] "IFG" refers to State Street's Independent Fiduciary Group, itself composed of investment professionals experienced in managing company stock funds for ERISA-covered pension plans.

share. The divestment decision was communicated to the Plan's participants, who were also informed that the situation would continue to be monitored in case a change in strategy became necessary by reason of changed circumstances.

Between February 25 and April 6, 2004, State Street sold approximately 900,000 shares of Grace stock in the open market transactions at then-prevailing New York Stock Exchange trading prices, ranging from $2.86 to $3.00 per share. During this period, State Street continued to monitor the Grace stock and received regular updates from D&P regarding its equity valuation conclusion for Grace.

On April 2, 2004, Shaw, an independent investor, made State Street an unsolicited offer to purchase the remaining 6.2 million shares of Grace stock still in the Plan's portfolio. The offer was for the entire lot at $3.50 per share, which was 8% higher than the closing price of $3.24 per share on April 1, and almost twice the mid-point equity valuation of $1.36 per share assessed by D&P as of March 31, 2004. In the meantime, developments in the proposed legislative settlements required further investigation by D&P and additional meetings with State Street, but ultimately it was concluded that there was no further need for D&P to re-evaluate the equity valuation for Grace. This hiatus led to Shaw lowering its offer to $3.25 per share, after which Goodwin Procter LLP advised the Fiduciary Committee on recent

events regarding Grace's exposure to asbestos liabilities. The Fiduciary Committee reaffirmed the basis for its conclusion that Grace stock was an inappropriate investment for the Plan because of the factors already considered, including the bankruptcy status of the company, the uncertainty that equity holders would receive value for the stock, and the outstanding asbestos litigation. The fundamentals regarding the Grace stock remaining unaltered from when the question was previously considered, the Fiduciary Committee voted unanimously to sell the remaining shares to Shaw provided that the original offer price of $3.50 was reinstated and that the sale did not burden the Plan with any commission expenses. The sale to Shaw was effectuated in two transactions, on April 12 and 19, 2004, at $3.50 per share, approximately 18% higher than the market closing price on those dates.

There can be little doubt on this record that the state of Grace's corporate health was thoroughly studied by experts who debated and considered ad nauseam the pros and cons of retaining or selling the stock held in the Plan's portfolio. The unanimous conclusion of those charged with making the decision was that divestment of this stock was the only action consistent with the prudence required of a responsible fiduciary under ERISA. Without question, State Street engaged in a substantively sound, reasonable analysis of all relevant circumstances appropriate to the decision

to sell the Grace stock. We cannot say that the district court's approval of these actions was in error.

Appellants seek to induce us to reject State Street's actions by having us apply a presumption of prudence which is afforded fiduciaries when they decide to retain an employer's stock in falling markets, first articulated in Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995) and Moench, 62 F.3d at 571-72. The presumption favoring retention in a "stock drop" case serves as a shield for a prudent fiduciary. If applied verbatim in a case such as our own, the purpose of the presumption is controverted and the standard transforms into a sword to be used against the prudent fiduciary. This presumption has not been so applied, and we decline to do so here, as it would effectively lead us to judge a fiduciary's actions in hindsight. Although hindsight is 20/20, as we have already stated, that is not the lens by which we view a fiduciary's actions under ERISA. DiFelice, 497 F.3d at 424; Roth, 16 F.3d at 917-18. Rather, given the situation which faced it, based on the facts then known, State Street made an assessment after appropriate and thorough investigation of Grace's condition. Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984).[9] This

---

[9] A fiduciary charged with making investment decisions on behalf of an ERISA plan is required (1) to "employ[] the appropriate methods to investigate the merits of the investment and to structure the investment;" (2) to "act[] in a like capacity [of others] familiar with such matters;" and (3) to conduct an "independent investigation of the merits of a particular investment", id. (quotation marks omitted).

-20-

assessment led it to find that there was a real possibility that this stock could very well become of little value or even worthless to the Plan.  It is this prudent assessment, and not a presumption of retention, applicable in another context entirely, which controls the disposition of this case.  See also LaLonde v. Textron, Inc., 369 F.3d 1, 6-7 (1st Cir. 2004) (expressing hesitance to apply a "hard-and-fast rule" in an ERISA fiduciary duty cases, and instead noting the importance of record development of the facts).

### III. Conclusion

The decision of the district court is **affirmed**.

Costs are imposed on appellants.