# United States Court of Appeals
## For the First Circuit

No. 08-2414

AMERICAN LEASE INSURANCE AGENCY CORPORATION,
Plaintiff, Appellant,

A.I. CREDIT CONSUMER DISCOUNT COMPANY,
Third Party Defendant, Appellant,

v.

BALBOA CAPITAL CORPORATION,
Defendant/Third Party Plaintiff, Appellee,

BALBOA LIFE & CASUALTY COMPANY,
Third Party Defendant, Appellee.

————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

————————

Before

Torruella, Circuit Judge,
Tashima,* Senior Circuit Judge,
and Lipez, Circuit Judge.

————————

James C. Donnelly, Jr., with whom Michael R. Christy and
Mirick, O'Connell, DeMallie & Lougee, LLP, were on brief for
appellants.
Alan A. Heller, with whom Heller, Horowitz & Feit, P.C., was
on brief for appellee Balboa Capital Corporation.

————————

August 26, 2009

————————

* Of the Ninth Circuit, sitting by designation.

**TORRUELLA, <u>Circuit Judge</u>**.  This diversity case involves a set of contracts between four corporations, who all agree that New York law governs this action.  On one side is defendant-appellee Balboa Capital Corporation ("BCC"), who provides and finances equipment leases for small businesses, and third-party defendant-appellee Balboa Life & Casualty Company ("Balboa Life"),[1] the parent company of the insurance provider Balboa Insurance Company ("Balboa Insurance").[2]  On the other side are plaintiff-appellant American Lease Insurance ("ALI") and third-party defendant-appellant A.I. Credit Consumer Discount Company ("AICCDC"), both of whom contracted with BCC to insure BCC's equipment for lessees who did not have their own insurance.  ALI and AICCDC are represented by the same counsel and their positions are united.

This case comes to us following cross-motions for summary judgment. The district court agreed with BCC's interpretation of the agreements at issue in this case and granted summary judgment in its favor.  After careful consideration, we reverse and remand.

---

[1]  The similarity of this name and BCC's is coincidental.

[2]  Neither the insurer nor the parent company submitted a brief in this appeal.

## I.  **Background**

### A.  **Relevant Documents and Relationship of Parties**

BCC leases commercial equipment and provides commercial equipment lease financing services to business lessee customers throughout the United States.  Under its standard equipment lease, BCC requires its lessees to obtain property and liability insurance coverage on the leased equipment and designate BCC as the loss payee and additional insured.  When a lessee fails to obtain or maintain insurance, BCC protects its property interests as owner and lessor of the equipment by procuring insurance for the equipment in BCC's own name and naming BCC as policy owner and sole insured.  It then bills the lessee for the insurance cost, including premiums and a service fee.

ALI is a licensed insurance agency that provides equipment lease insurance programs to equipment lease financing companies such as BCC.  On October 2, 2006, ALI and BCC entered into an initial six-month lease insurance agreement ("Original Program Agreement") which would cover existing leases and any new leases begun after October 2, 2006.  Under the agreement, ALI was appointed to serve as BCC's "Insurance Manager," with duties including monitoring insurance coverage on leases, communicating with lessees, processing evidence of lessees who had obtained alternative coverage, and issuing coverage on leases when lessees failed to obtain their own coverage.  ALI also was required in

certain situations to cancel lease insurance, such as when a lessee failed to pay its insurance charges or when a lessee obtained other insurance that satisfied certain agreed-upon criteria.

In setting up the Original Program Agreement, ALI acted as agent for Balboa Insurance, a subsidiary of Balboa Life. Balboa Insurance was the actual issuer of the insurance policy ("Insurance Policy") to BCC. BCC agreed to renew its agreement with ALI in April 2007. This agreement ("Program Agreement"), effective on April 2, 2007, is one of the central documents in this dispute.

In order to avoid the risk and expense of financing this insurance itself, BCC also entered into a six-month agreement ("Original Finance Agreement") on October 2, 2006 to finance the Insurance Policy through AICCDC. Under this agreement, AICCDC would advance the insurance premiums (owed to Balboa Insurance) and insurance manager fees (owed to ALI). These funds were gradually recouped from the insurance charges BCC billed to its individual lessees and then sent to AICCDC. AICCDC also received a finance charge ("FINCO charge") as compensation. BCC, thus, did not have to dedicate any capital to maintaining this insurance. In fact, BCC earned money on the deal: it is designated as subcontractor in the Program Agreement, with duties to transfer data on lessees and bill and collect insurance charges on the covered leases, and it is compensated for these services. In April 2007, BCC renewed its

-4-

agreement with AICCDC. This agreement ("Finance Agreement"), effective on April 2, 2007 as well, is also at issue in this case.

Both the Finance Agreement and the Program Agreement were set to renew automatically at one-month intervals. But either side could terminate without cause by providing written notice at least ten days prior to the next renewal date.[3] In the event of such termination, however, § 21(b) of the Program Agreement provides that:

> the Insured Lessor [BCC] agrees that all Coverage effective prior to termination shall remain in effect with the Insurance Company [Balboa Insurance]. The Insurance Manager [ALI] shall not thereafter cancel Coverage with respect to any Lease of Equipment that is subject to Coverage at the time of termination of this Agreement, except as provided in this Agreement or the Insurance Policy.

Similarly, § 14 of the Finance Agreement provides that following termination without cause, "this Agreement shall continue in full force and effect with respect to Leases which remain subject to Coverage at the time of termination of this Agreement."

Section V of the Insurance Policy, which is referred to in § 21(b), sets forth basic provisions for termination and is entitled "How Coverage May be Voided or Canceled." Section V.2 covers "How YOU [BCC] may cancel this Policy," and § V.3 covers

---

[3] That is, ALI (in § 21(b) of the Program Agreement) or AICCDC (in § 14 of the Finance Agreement) could terminate without cause, and BCC could terminate either agreement without cause.

"How WE [Balboa Insurance] may cancel this Policy." Both sections contain near-identical language: first, the cancelling party must, at least ninety days in advance, send "written notice of when the cancellation will be effective." Following cancellation, "coverage on **Covered Equipment** issued prior [to] the effective date of [the] cancellation of [this] Policy will remain in effect until individually canceled as provided in Section V, paragraph 1 above or until termination of each lease agreement of **Covered Equipment**."

Sections V.2 and V.3, respectively, refer to the individual cancellations that are provided by § V.1, entitled "What happens if YOUR [BCC's] LESSEE has other coverage." Because of the timeframe of this dispute, the relevant paragraph is § V.1(b), which covers time "Before a Loss[4] [i.e. damage to, or theft of, leased equipment], and six months or more after the date coverage commences under this Policy." § V.1(b) provides that "If OUR Agent [ALI] is notified" timely

> that there is other specific insurance on the individual **Covered Equipment** that meets all the requirements in YOUR [BCC's] lease agreement, as determined by YOU [BCC], OUR [Balboa Insurance's] coverage will be canceled as of [one of two date calculations]; and in either case all related unearned premiums as of such cancellation date will be refunded to YOU [BCC].

---

[4] According to the sixth paragraph of "Definitions" in the Insurance Policy, "Loss" means **Theft, damage or destruction of Covered Equipment.**"

-6-

Approximately half of BCC's lessees opted to use the default insurance system provided by the BCC-ALI-AICCDC agreements.

## B.  The Instant Dispute

The instant dispute was set in motion because BCC eventually found another insurance company willing to handle the entire insurance operation itself at a lower cost.  On October 15, 2007, BCC sent ninety-day termination notices (the notice required by the Insurance Policy) to ALI, AICCDC, and Balboa Insurance, terminating their respective agreements effective January 15, 2008. Apparently realizing that only ten days' notice was required under the Program and Finance agreements, BCC then notified ALI (on November 1) and AICCDC (on November 5) by letter that it wished to terminate those agreements without cause.  Thereafter, BCC sent ALI 1452 separate cancellation notices for each of the leases then being managed by ALI covered under the Insurance Policy.

ALI rejected these notices and filed suit in the United States District Court for the District of Massachusetts in late November 2007.  It later filed an amended complaint on December 10, 2007, asking for a declaratory judgment that the Program Agreement remain in force.  BCC filed a third-party action against AICCDC, which joined the litigation and filed counterclaims in May 2008. By informal agreement, BCC continued the Program and Finance Agreements until April 9, 2008, when it ceased performing any obligations under those agreements.  Without BCC's subcontractor

services, ALI claims that it was unable to continue managing insurance and canceled insurance on the 1259 remaining covered leases.

All three parties sought declaratory relief and claimed breach of contract and unjust enrichment. Both sides filed summary judgment motions and stipulated to an undisputed set of material facts. The district court denied the summary judgment motions of ALI and AICCDC as to all claims, and granted summary judgment in favor of BCC, declaring that BCC had a right to cancel its existing insurance coverage and that it was entitled to damages.[5] ALI and AICCDC appeal, claiming that the district court erred in its interpretation of the contractual language at issue here and that it failed to recognize and apply the implied covenant of good faith and fair dealing.

## II. **Discussion**

### A. **Standard of Review**

Whether under summary judgment or a case stated, determinations of law are reviewed de novo. See Bunch v. W.R. Grace & Co., 555 F.3d 1, 3 & n.4 (1st Cir. 2009) (holding that in

---

[5] There is some confusion about the exact procedure that the district court used in ruling on the cross-motions for summary judgment. The transcript of the summary judgment hearing indicates that both parties may have sought to have the dispute adjudicated as a "case stated." However, the order below seems to treat the cross-motions as simply cross-motions for summary judgment, rather than as a case stated. The distinction is irrelevant for our purposes because our result depends only on matters of law.

-8-

reviewing a case stated, "[t]he district court's legal conclusions are, of course, subject to de novo review") (citation omitted).[6] "According to New York law, construction of an agreement presents a question of law." Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.), 375 F.3d 51, 63 (1st Cir. 2004). Thus, we review the issue of contract interpretation presented here de novo. See id.

## B. New York Contract Law

Although "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent[,] . . . [t]he best evidence of what parties to a written agreement intend is what they say in their writing." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002) (internal citations and quotations omitted). "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990). Thus, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally

---

[6] BCC's argues that in reviewing a case stated, we should apply a clearly erroneous standard of review. This argument is unavailing. We are reviewing the district court's interpretation of contractual language, which is a legal conclusion subject to de novo review.

inadmissible to add to or vary the writing." Id. (internal citations omitted).

In addition, when sophisticated commercial parties such as those in this litigation include a merger clause in their contract, its purpose "is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." Primex Int'l Corp. v. Wal-Mart Stores, Inc., 679 N.E.2d 624, 627 (N.Y. 1997). Even when a merger clause is present, extrinsic evidence may still be used to shed light on the meaning of existing terms, but such evidence is only admissible when the language of the contract is ambiguous on its face. See R/S Assocs. v. N.Y. Job Dev. Auth., 771 N.E.2d 240, 242-43 (N.Y. 2002). However, "'[e]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" Id. at 242 (quoting W.W.W. Assocs., 566 N.E.2d at 639). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield, 780 N.E.2d at 170-171 (internal citations and quotations omitted) (alteration in original). Finally, "[w]hether a contract is ambiguous is a question of law. . . ." S.

Rd. Assocs. LLC, v. Int'l Bus. Machs. Corp., 826 N.E.2d 806, 809 (N.Y. 2005).[7]

### 1. ALI and BCC

At its core, the dispute between ALI and BCC centers around the language contained in § 21(b) of the Program Agreement, which covers termination without cause. Section 21(b) reads as follows:

> [1] Either party may terminate this Agreement at the end of the initial term or any successive one (1) month term without cause upon ten (10) days' prior written notice to the other party. [2] In the event of such termination, the Insured Lessor [BCC] agrees that all Coverage effective prior to termination shall remain in effect with the Insurance Company [Balboa Insurance]. [3] The Insurance Manager [ALI] shall not thereafter cancel Coverage with respect to any Lease of Equipment that is subject to Coverage at the time of termination of this Agreement, except as provided in this Agreement or the Insurance Policy.

Neither ALI nor BCC disputes that, pursuant to the first sentence of § 21(b), BCC was allowed to terminate its agreement with ALI without cause, as it did through its November 1, 2007

---

[7] BCC also argues that this court should construe the Program and Finance Agreements against their respective drafters, ALI and AICCDC. But this rule is only applied in cases of ambiguity. Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it. . . ." (internal citation omitted)). There is no ambiguity here; thus, we do not apply this rule.

termination letter.  However, ALI and BCC dispute the legal effect of the second and third sentences of § 21(b).

ALI argues that the second and third sentences of § 21(b) unambiguously establish that any existing coverage would survive termination of the Program Agreement.  According to ALI, the second sentence is addressed to BCC and prevents BCC from doing exactly what it has done here -- it is a categorical prohibition on cancellation of any coverage managed by ALI prior to the termination of the Program Agreement.[8]  With respect to the third sentence, ALI argues that it is addressed to ALI and "reinforces the protection of BCC's interest by preventing ALI from cancelling existing coverage and thereby leaving BCC uninsured in the event the Program Agreement is terminated."  ALI maintains that nothing in the third sentence, even its references to the Insurance Policy, alters the plain meaning of the second sentence.  Further, because the Program Agreement contains a merger clause, ALI states that we cannot look to the Insurance Policy or other extrinsic evidence to interpret the second sentence of § 21(b).

For its part, BCC maintains that the district court correctly held that the Program Agreement was ambiguous and that

---

[8]  According to ALI, this makes sense: although most of ALI's work in setting up insurance on leases comes up-front, its payment is a "straight line" over the life of the lease as insurance premium payments come in.  These sentences, ALI maintains, protect its time investment and ensure that it gets the benefit of its bargain, even after BCC terminates without cause.

the Insurance Policy supplies requisite clarification. Alternatively, BCC argues that even if the Program Agreement is unambiguous, it is still proper to look to the Insurance Policy because it was recognized and incorporated by the third sentence. With respect to the Insurance Policy, BCC argues that § V.1(b)[9] allows BCC to cancel coverage for all leases "no matter how this other coverage came about, who provided the notification or who the named insured is or will be." Specifically, it contends that the 1452 individual cancellation notices it sent to ALI are notices "that there is other specific insurance on the individual **Covered Equipment**" which meets BCC's own criteria, as determined by BCC.[10]

---

[9] As noted above, § V.1 is entitled "What happens if YOUR LESSEE has other coverage" and § V.1(b) provides that when ALI is timely notified

> that there is other specific insurance on the individual **Covered Equipment** that meets all the requirements in YOUR [BCC's] lease agreement, as determined by YOU [BCC], OUR [Balboa Insurance's] coverage will be canceled as of [one of two date calculations]; and in either case all related unearned premiums as of such cancellation date will be refunded to YOU [BCC].

[10] BCC also argues that its interpretation of § 21(b) should prevail based on the history of the agreement. The same language appeared in the Original Program Agreement. According to BCC, both parties agreed that their initial relationship was a six-month trial period, with both sides free to walk away after six months. BCC contends that its view of the language makes more sense in this case, because it would allow both parties to be free fairly quickly of obligations on termination. We need not reach this question, however -- the Original Program Agreement is extrinsic evidence for the interpretation of the Program Agreement. As we have noted above, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Assocs., 566 N.E.2d at 642.

-13-

We disagree with BCC and conclude that § 21(b) of the Program Agreement is unambiguous. By its plain terms, the second sentence states that coverage will continue even if BCC cancels without cause. The third sentence does not place a limit on BCC's obligation under the second sentence; rather it is phrased as a condition on ALI's behavior (and not BCC's) and speaks to ALI's continuing obligation to BCC if either party were to terminate without cause.[11] Also, while BCC is correct that the Insurance Policy is expressly incorporated by the Program Agreement, see CooperVision, Inc. v. Intek Integration Techs., Inc., 794 N.Y.S.2d 812, 819 (N.Y. Sup. 2005) ("The well settled rule is that 'a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.'") (quoting Guerini Stone Co. v. P.J. Carlin Constr. Co., 240 U.S. 264, 277 (1916)), the Insurance Policy's legal effect is incorporated only to the extent that it details particular circumstances where ALI is exempt from its obligation to

Because we find no ambiguity in the Program Agreement, we do not consider the earlier agreement.

[11] Once again, the third sentence of § 21(b) states that the "Insurance Manager [ALI] shall not thereafter cancel Coverage . . . except as provided in this Agreement or the Insurance Policy." ALI is the grammatical subject.

-14-

continue coverage post-termination as specified by third sentence in § 21(b).[12]

Even if we were to consider the Insurance Policy more broadly, BCC's reading would still fail because it contravenes the intent of the parties as expressed by the Insurance Policy's plain language. Specifically, § V.1 is addressed to individual lessees, not to BCC, ALI, or Balboa Insurance.[13] Further, § V contains two separate provisions that deal with cancellation of the agreement by BCC (§ V.2 entitled "How YOU may cancel this Policy") and by Balboa Insurance (§ V.3 entitled "How WE may cancel this Policy").[14] Under both cancellation provisions, leases insured by Balboa Insurance

---

[12] The Insurance Policy is an agreement between Balboa Insurance and BCC, but ALI acts as Balboa Insurance's agent, and so has obligations under the Policy.

[13] Even without the aid of § 21(b) of the Program Agreement, the parties' intent that § V.1 govern only individual lessees is clear from the respective section titles of §§ V.1 and V.2. And as mentioned above, § V.2 expressly requires that coverage prior to cancellation will remain in effect until "individually canceled." The phrase "individually canceled" is inconsistent with an en masse, wholesale termination of the agreement with respect to the 1452 existing leases. The language "meets all the requirements in YOUR [BCC] lease agreement, as determined by YOU [BCC]," as set forth in § V.1(b) of the Insurance Policy, simply allows BCC final say over its own insurance criteria.

[14] As noted above, §§ V.2 and V.3 of the Insurance Policy both state that following written notice of cancellation:

> coverage on **Covered Equipment** issued prior [to] the effective date of [the] cancellation of [this] Policy will remain in effect until individually canceled as provided in Section V, paragraph 1 above or until termination of each lease agreement of **Covered Equipment**.

-15-

(with ALI as agent and manager) are to continue after termination of the overall policy. Both provisions thus contemplate a continuation of the status quo -- just as do the Program and Finance Agreements. This is consistent with ALI's claim that the contracts were structured to fully compensate ALI for its front-loaded work.[15] The parties included two sections clearly designed to cover each side's cancellation, as indicated by the titles of each section and their language.

BCC's interpretation is especially unpersuasive when we read § V of the Insurance Policy alongside § 21(b) of the Program Agreement. BCC's obligations (if any) under § V.1(b) must remain consistent with the second sentence of § 21(b). It would be inconsistent with that sentence to allow BCC to effect 1452 individual terminations under § V.1(b), and it would frustrate the purpose of that sentence to give BCC an alternative means of cancellation under the Insurance Policy. Instead, it is clear that the Insurance Policy is only referenced to ensure that ALI's existing managerial obligations continue even after a prospective termination.

---

[15] BCC argues that this reading cannot be correct because it would mean that Balboa Insurance would have to continue its coverage on existing leases in the event that Balboa Insurance canceled the Insurance Policy. This is a non sequitur -- ALI, as manager, would have the same interest in being paid in full for its work, regardless of whether BCC or Balboa Insurance canceled.

Thus, we agree with ALI that a proper construction of the Program Agreement and the Insurance Policy does not allow BCC to unilaterally cancel individual insurance policies, and any existing coverage would survive termination of the Program Agreement.

## 2. AICCDC and BCC

We turn next to the relationship between AICCDC and BCC. The Finance Agreement is nominally separate from the Program Agreement and the Insurance Policy. We construe the three documents together because they were part of the same transaction.[16] See This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) (noting that "[u]nder New York law, all writings forming part of a single transaction are to be read together" and approving jury instruction that "New York law requires that all writings which form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties").

The relevant provision of the Finance Agreement is § 14, entitled "Termination." Most of the language in § 14 explicitly covers termination for cause. It is clear that the first sentence authorizes termination by either side without cause given ten days notice, similar to the Program Agreement. And, similar to the Program Agreement, § 14 of the Finance Agreement also contains a

---

[16] Though the logic of the Finance Agreement stands on its own, we are influenced in our reading by the other agreements.

-17-

continuation proviso: in case of termination without cause, "this Agreement shall continue in full force and effect with respect to Leases which remain subject to Coverage at the time of termination of this Agreement" ("Continuation Proviso").

The parties disagree about the effect of the lengthy final sentence of the paragraph which provides as follows:

> Whenever any party notifies the other party of the termination of this Agreement, upon the effective date of such termination . . . :
> (a) AICCDC shall pay in immediately available funds to Insured Lessor the unearned portion of the Insurance Charges remitted by Insured Lessor to AICCDC for all then existing Coverage, and
> (b) Insured Lessor shall pay to the AICCDC in immediately available funds to the extent that Insurance Charges are earned prior to such date:
> (i) all such Insurance Charges, less Subcontractor Fees, collected from Lessees prior to such date and not previously remitted, and
> (ii) all such Insurance Charges, less Subcontractor Fees, collected on or after such date, which shall be remitted to AICCDC promptly upon such receipt.

That is, each party will return any unearned money and will be entitled to any money earned up to that point.

BCC argues that, the Continuation Proviso notwithstanding, the language of the final sentence -- "Whenever any party notifies the other party of the termination of this Agreement" -- controls in this case because the Agreement has been terminated, and therefore both parties must reconcile their

-18-

finances in accordance with the rest of the final sentence. Thus, BCC argues, § 14 clearly contemplates a clean and simple termination of the agreement.

Arguing against this reading, AICCDC contends that the Continuation Proviso would be rendered meaningless under BCC's reading of the final sentence. However, AICCDC argues that the Continuation Proviso can be reconciled with the final sentence by noting that the final sentence has effect only "upon the effective date of such termination." Because the Continuation Proviso states that "this Agreement shall continue in full force and effect with respect to Leases which remain subject to Coverage at the time of termination of this Agreement," there never is a termination with respect to leases covered at the time of the overall Agreement's termination, and the provisions of the final sentence are never triggered. That is, AICCDC sees termination without cause under § 14 as prospective only, covering new leases but leaving undisturbed existing leases.

We agree with AICCDC's reading of § 14. "In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 472 N.E.2d 315, 318 (N.Y. 1984) (internal citations omitted); see also Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) (noting that "[u]nder New York law an interpretation of a contract that has the effect of rendering at

least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible" and that "an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect") (internal citations and quotations omitted); God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP, 845 N.E.2d 1265, 1267 (N.Y. 2006) ("A contract should be read to give effect to all its provisions.") (internal quotations omitted). BCC's reading of § 14 would render the Continuation Proviso meaningless surplusage and would call its inclusion in the document into serious question. AICCDC's reading leaves the "Whenever" clause with meaning: it applies in cases of termination for cause. AICCDC's reading is also consonant with our interpretation of the Program Agreement.

Moreover, when general language, such as the "Whenever" clause (which on its face covers termination for or without cause) is in conflict with more specific language, such as the Continuation Proviso (which on its face applies only in case of termination without cause), the specific language controls. See Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 689 (N.Y. 1956); Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner a.s., 671 N.Y.S.2d 905, 910 (N.Y. App. Div. 1998) (same); see also William Higgins & Sons, Inc. v. New York, 231 N.E.2d 285, 286 (N.Y.

-20-

1967) ("A specific provision will not be set aside in favor of a catchall clause.").

### C.  Good Faith and Fair Dealing

We need not reach ALI and AICCDC's claim that BCC breached the implied covenant of good faith and fair dealing because under New York law it is duplicative of a breach of contract claim.  See Engelhard Corp. v. Research Corp., 702 N.Y.S.2d 255, 256 (N.Y. App. Div. 2000) ("The cause of action for breach of the implied covenant of good faith and fair dealing was properly dismissed as duplicative of the breach of contract claim."); see also In re Houbigant, Inc., 914 F. Supp. 964, 989 (S.D.N.Y. 1995) ("A duty of good faith and fair dealing is implicit in every contract.  However, a breach of that duty will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract.").

### III.  Conclusion

For the foregoing reasons, we hold that, as a matter of law and without reliance on any facts beyond those stipulated to by both parties, the district court's grant of summary judgment in favor of BCC was in error.  Instead, we conclude that ALI and AICCDC were entitled to summary judgment.  We therefore reverse the district court's ruling and remand for entry of summary judgment and calculation of damages consistent with this opinion.

-21-

**<u>Reversed and Remanded</u>**.