# United States Court of Appeals
## For the First Circuit

No. 17-1693

JAMES ELLIS; WILLIAM PERRY,

Plaintiffs, Appellants,

v.

FIDELITY MANAGEMENT TRUST COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

Garrett W. Wotkyns, with whom Schneider Wallace Cottrell
Konecky Wotkyns LLP was on brief, for appellants.
Jonathan D. Hacker, with whom Brian D. Boyle, Gregory F.
Jacob, Meaghan VerGow, Bradley N. Garcia, O'Melveny & Myers LLP,
John J. Falvey, Jr., Alison V. Douglass, and Goodwin Procter LLP
were on brief, for appellee.

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

February 21, 2018

**KAYATTA**, **Circuit Judge**.  Plaintiffs James Ellis and William Perry brought this certified class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that Fidelity Management Trust Company, the fiduciary for a fund in which plaintiffs had invested, breached its duties of loyalty and prudence in managing the fund.  Fidelity won summary judgment and plaintiffs appealed.  Because the district court correctly concluded that plaintiffs failed to adduce evidence necessary to proceed to trial, we affirm.

## I.

"On review of an order granting summary judgment, we recite the facts in the light most favorable to the nonmoving party" to the extent that they are supported by competent evidence. Walsh v. TelTech Sys., Inc., 821 F.3d 155, 157–58 (1st Cir. 2016) (quoting Commodity Futures Trading Comm'n v. JBW Capital, 812 F.3d 98, 101 (1st Cir. 2016)); see Burns v. State Police Ass'n of Mass., 230 F.3d 8, 9 (1st Cir. 2000) (noting that competent evidence is necessary to defeat summary judgment).  We take these facts from the parties' summary judgment filings in the district court and from the record at large where appropriate.  See Evergreen Partnering Grp. v. Pactiv Corp., 832 F.3d 1, 4 n.2 (1st Cir. 2016).

## A.

Plaintiffs were participants in the Barnes & Noble 401(k) plan, which allowed participants to allocate their savings

among an array of investment alternatives depending on their objectives. Department of Labor regulations encourage employers who create plans of this type to offer at least one relatively safe investment vehicle, described as an "income producing, low risk, liquid" investment. 29 C.F.R. § 2550.404c-1(b)(2)(ii)(C)(2)(ii). A stable value fund is an example of such an investment vehicle. In this instance, Barnes & Noble chose to offer its employees a stable value fund run by Fidelity and known as the Managed Income Portfolio ("MIP").

Three typical features of stable value funds are salient here. First, a stable value fund generally consists of an underlying portfolio of high-quality, diversified, fixed-income securities. Second, a stable value fund generally utilizes a "crediting rate" that takes into account gains and losses over time and determines what amount of interest will be credited to investors, and at what intervals this will occur. Third, a stable value fund often utilizes "wrap insurance," a form of insurance providing that, subject to exclusions, when a stable value fund is depleted such that investors cannot all recover book value,[1] the insurance provider will cover the difference. Because the entity providing the wrap insurance hopes it will not have to make good

_____

[1] "Book value" is the value of principal invested by each participant, plus the interest credited to the participant as determined by the crediting rate.

- 4 -

on its promise, wrap contracts will often contain investment guidelines imposing limitations on the composition of a stable value fund's portfolio.  For example, a wrap provider might demand that a certain portion of a portfolio's underlying securities be treasury bonds or similar investments that sacrifice higher returns in favor of increased safety in preserving capital.

Fidelity described to putative investors the MIP's investment objective as follows:  "The primary investment objective of the Portfolio is to seek the preservation of capital as well as to provide a competitive level of income over time consistent with the preservation of capital."  As a benchmark, the MIP used the Barclay's Government/Credit 1-5 A- or better index ("1-5 G/C index") throughout the relevant time period.[2]  On a quarterly basis, Fidelity made available to all plans that offered the MIP fact sheets disclosing investment allocations, current crediting rate, investment durations, and the MIP's returns.  More than 2,500 employers, including several sophisticated Wall Street employers, made the MIP available to their employees throughout the class period.

In the wake of the 2007-2008 financial crisis and the ensuing economic decline, Fidelity fund managers expressed concern

_____

[2] According to plaintiffs' expert, this index consists of public government and corporate securities, rated A or better, with maturities between one and five years.

about the availability of wrap insurance for Fidelity's various funds, including the MIP, going forward. For example, a 2009 PowerPoint noted a "[d]earth of new wrap capacity." During this time period, several major wrap providers for the MIP, including AIG, Rabobank, and at a later point, JP Morgan, forecasted an intention to leave the wrap market. Further illustrating Fidelity's concern is a 2011 e-mail from an attorney for Fidelity, noting that JP Morgan had been "shed[ding]" wrap capacity, that there were a "dwindl[ing]" number of new entrants into the wrap market, and that Fidelity ran the risk of being "left out in the cold" if the number of insurers of stable value funds was limited, as he expected it to be. Ultimately, Fidelity secured sufficient wrap coverage; certain providers either remained in the market or transferred their wrap business to other entities and Fidelity also obtained wrap coverage from a new source.

**B.**

During the years covered by this lawsuit, the MIP fully achieved its objective of preserving the investors' capital. The rate of return earned by investors, however, lagged behind that of many other stable value funds offered by competitors. The immediate cause of these lower returns is undisputed: Fidelity allocated MIP investments away from higher-return, but higher-risk sectors (e.g., corporate bonds, mortgage pass-throughs, and asset-backed securities) and toward treasuries and other cash-like or

- 6 -

shorter duration instruments. While these allocations made the MIP a safer bet and thus more attractive to wrap providers, they also positioned the MIP less favorably in the event that markets improved. Markets did improve, the added safety turned out not to be required, and competitors whose investments were more aggressive achieved both asset protection and higher returns. As a result, Fidelity saw its assets under management and its market share fall until 2014. It was not until 2015 that Fidelity managed to achieve the approximate average returns realized by competitors' stable value funds.

Of course, such is what occurs in most markets, and certainly most investment markets. Fund managers make different predictions about future market performance, and the differences ultimately generate a distribution curve of returns as some funds do better than others. Every year, by definition, one quarter of funds fall into the bottom quartile and one quarter fall in the top quartile, even if all fund managers are loyal to their investors and prudent in their decisions.

Plaintiffs, though, say that something else was at work here. They say that the MIP's relatively low returns as compared to those of many other stable value funds were the result of disloyalty and imprudence in violation of section 404(c)(1) of ERISA. 29 U.S.C. § 1104(a)(1). While plaintiffs' precise explanations for how this is so have moved throughout this

litigation like a toy mole in an arcade game, the constant and essential fact to which they point is Fidelity's conduct in procuring wrap coverage for the MIP. Specifically, plaintiffs claim that Fidelity agreed to overly conservative investment guidelines in a failed effort to lock up all wrap coverage so that its competitors would not be able to obtain such coverage, allowing Fidelity to corner the stable value market and generate business for its many other stable value funds even if the MIP suffered.

Additionally, plaintiffs argue that Fidelity was imprudent in structuring and operating the MIP by being overly and unnecessarily conservative. Specifically, a prudent Fidelity would have (say plaintiffs) negotiated less restrictive wrap guidelines, picked a more aggressive benchmark, and invested in higher-risk, higher-return instruments.

The district court denied a motion to dismiss and certified a class. After the parties completed an ample amount of discovery, the district court found plaintiffs' arguments to lack the evidentiary support needed to survive summary judgment. See Ellis v. Fidelity Mgmt. Tr. Co., 257 F. Supp. 3d 117, 119 (D. Mass. 2017). This appeal followed.

## II.

On appeal, plaintiffs claim two distinct errors. First, they contend that in evaluating their loyalty claim, the district court applied the wrong standard, thus committing an error of law.

Second, they submit that the district court impermissibly weighed evidence at the summary judgment stage, where such weighing is inappropriate. Had it credited their version of events, they say, it would have found triable issues and denied summary judgment. We consider each argument in turn.

**A.**

The choice of the standard by which to evaluate a claim is a question of law, which we review de novo. United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir. 2007). Here, the district court stated that "ERISA . . . requires an ERISA fiduciary to honor the duty of loyalty by 'discharging his duties with respect to a plan solely in the interest of the participants.'" Ellis, 257 F. Supp. 3d at 126 (quoting 29 U.S.C. § 1104(a)(1) (brackets omitted)). The district court went on to cite our decision in Vander Luitgaren v. Sun Life Assurance Co. of Canada, 765 F.3d 59 (1st Cir. 2014), for the proposition that "an accompanying benefit to the fiduciary is not impermissible -- it more simply 'require[s] . . . that the fiduciary not place its own interests ahead of those of the Plan beneficiary.'" Ellis, 257 F. Supp. 3d at 126 (alteration in original) (quoting Vander Luitgaren, 765 F.3d at 65).

Plaintiffs do not dispute that the district court accurately quoted the statutory language. Nor do they expressly contend that Vander Luitgaren does not set forth the controlling

law.  Instead, in their opening brief, plaintiffs devote much attention to an opinion of the Second Circuit, Donovan v. Bierwirth, 680 F.2d 263 (2d Cir. 1982).  That opinion says that an ERISA fiduciary's decisions "must be made with an eye single to the interests of the participants and beneficiaries."  Id. at 271.  Plaintiffs seem to read this phrase as meaning that a fiduciary can only be motivated by a beneficiary's interests, even if that interest aligns with the fiduciary's own interests.  Plaintiffs submit that the district court should have applied that reading of Donovan and denied summary judgment because record evidence could have supported the conclusion that Fidelity's operative motive was to further its own interests.

This is all a bit of a puzzler because plaintiffs never mentioned Donovan or the "eye single" language to the district court.  Moreover, in their reply brief, plaintiffs concede that Donovan and Vander Luitgaren do not conflict.  This of course raises the question:  How did the district court apply the wrong standard by expressly relying on a recent opinion of this court that does not conflict with plaintiffs' preferred earlier decision of another court?

We agree with plaintiffs' reply brief that there is actually no material difference relevant to this case between our standard as articulated in Vander Luitgaren and the "eye single" standard as actually applied in Donovan.  This is not to say that

- 10 -

either case (and certainly not Vander Luitgaren) would deem a fiduciary liable for disloyalty merely because it took action aimed at furthering an objective it shared with the beneficiaries. Donovan involved plan trustees who committed themselves to use plan assets to buy company stock without carefully considering whether it was in the interest of plan participants to do so. Indeed, the Second Circuit found it foreseeable that the purchase would harm plan participants. The court found it "almost impossible to believe that the trustees['] . . . motive . . . was for any purpose other than blocking [a hostile tender offer]." Donovan, 680 F.2d at 275. In other words, the trustees in Donovan did precisely what Vander Luitgaren prohibits -- they placed "[their] own interests ahead of those of the Plan beneficiary." Vander Luitgaren, 765 F.3d at 65.[3]

In any event, for present purposes the question is whether the district court employed the correct legal test in its evaluation of the evidence. The foregoing should make it clear that by quoting the statute and relying on the language and holding of Vander Luitgaren, the district court did so. In so concluding, we acknowledge a theoretical question posed in plaintiffs' brief on appeal: What if a fiduciary whose interests are aligned with

_____

[3] For this reason, plaintiffs' claim that the Supreme Court's unelaborated reference to Donovan in Pegram v. Herdrich, 530 U.S. 211, 235 (2000), provides no benediction for the interpretation plaintiffs would have us glean from the case.

the beneficiaries' interest takes action that a loyal but indifferent fiduciary might well take, but does so only "with an eye" toward the benefits that it will sustain?  As a practical matter, in most such circumstances it would be difficult to divine such a parsing of motives given the aligned interests of the fiduciary and beneficiaries.  One might also posit that most beneficiaries would prefer a trustee whose self-interests align with their own, rather than one who is personally indifferent to the beneficiaries' success.  In any event, we need not venture further into this abstract discussion because plaintiffs never argued such a theory of loyalty below, contending only that Fidelity was motivated by conflicting interests (which is indeed the redoubt to which plaintiffs retreat in their reply brief).  So we turn now to whether the evidence justified a trial based on that contention.

**B.**

"We review the district court's grant of summary judgment de novo."  Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017).  A grant of summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about [the issues in dispute] is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Cherkaoui, 877 F.3d at 23-

24 (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal quotation marks omitted)). While this is not a high bar to clear, we have also held that "[t]he test for summary judgment is steeped in reality. . . . We have interpreted Rule 56 to mean that the evidence illustrating the factual controversy cannot be conjectural or problematic . . . . [S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal quotation marks, citations, and brackets omitted).

**1.**

We begin with the theory underlying plaintiffs' loyalty claim. As best we can tell, it goes something like this: After the financial crisis of 2007–2008 and during the market decline thereafter, there was limited wrap capacity available on the market. Fidelity, which stood to earn more money the greater the total amount of its assets under management, swooped in to scoop up as much wrap capacity as possible, agreeing to excessively conservative guidelines in the process, in order to prevent competitors from obtaining wrap insurance and thereby preventing them from entering the stable value fund market. With fewer competitors in the stable value fund market, Fidelity would increase its assets under management and in turn increase the fees it collected. Central to plaintiffs' theory is the allegation

- 13 -

that Fidelity's "primary goal here was to prevent competitor access to wrap capacity to enable Fidelity to grow, for example, its separate account business [assets under management] at the expense of competitors, not to secure wrap capacity for the MIP."

The most obvious problem for plaintiffs' argument is that we, like the district court, have examined plaintiffs' Statement of Disputed Facts and find no evidence that the MIP itself did not face a threat of insufficient wrap coverage between 2009 and 2012. After a full round of discovery, plaintiffs adduced no evidence to this effect, nor did their expert so conclude. Plaintiffs point only to the fact that the MIP was "open to new funds" during the period. Plaintiffs see this fact as leading to the inference that Fidelity knew that the MIP was not going to lose its existing wrap coverage, on the assumption that if it risked the loss of such coverage, it would not leave the fund open to new investors until that risk was eliminated. This is quite a reach. A fund manager might easily perceive a need to find new wrap coverage yet leave the fund open to new investors based on an expectation that the manager will one way or another find new coverage. Even if plaintiffs' touted inference might be reasonable at the pleading stage and allow a case to survive a Rule 12(b)(6) motion to dismiss, it becomes unreasonable when confronted with a summary judgment motion after a full round of discovery producing

undisputed proof that existing wrap providers were threatening to exit the market in the wake of AIG's dance with failure.

Plaintiffs' theory of how Fidelity behaved disloyally suffers from the added disability of making little sense. To believe that Fidelity's competitors could be driven out of the market due to Fidelity's capture of available wrap insurance, one must also believe that wrap insurance at the relevant times was a scarce and limited resource. Were that the case, though, it would make no sense to posit that Fidelity had no reason to try hard to secure new wrap coverage for the MIP if its existing suppliers hinted at possible exit announcements. Conversely, if Fidelity knew that the supply of wrap insurance was not finite, attempts to purchase excessive quantities of it so as to deny competitors access would be equally illogical; one cannot consume all of a good where its quantity is effectively unlimited. Viewed thusly, plaintiffs' theory of a loyalty breach based on aggressive pursuit of wrap coverage requires that we infer that Fidelity embarked on a course that was not only against both its interests and the interests of its investors, but was also plainly illogical. Such an inference, without more to support it, is too speculative to carry a claim forward.

At oral argument, plaintiffs contended that there was a third state of the world; namely, that wrap coverage was indeed a finite good, but that Fidelity did not need to pursue it

- 15 -

aggressively because other insurance products, suitable for the MIP but not suitable for Fidelity's competitors, were available. Plaintiffs pointed to guaranteed investment contracts, or GICs, as an example. Thus, in plaintiffs' view, Fidelity's aggressive pursuit of wrap coverage was both unnecessary to protect MIP investors and consistent with attempts to freeze out Fidelity's competitors. There are multiple problems with this argument, the first being that plaintiffs did not raise it in their briefing before the district court. See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal.").[4] Even if we were to consider the argument, however, it would not persuade us. To succeed with this argument, plaintiffs would need to convince a reasonable factfinder that (a) GICs or other insurance products were an available and appropriate option for the MIP and (b) the same insurance products were not equally available to or appropriate for Fidelity's

---

[4] In a letter filed with the court pursuant to Federal Rule of Appellate Procedure 28(j), plaintiffs insist that they did, in fact, raise this theory before the district court. In support of their claim, however, plaintiffs point only to three separate paragraphs from their Local Rule 56.1 statement, not to any portion of their brief opposing summary judgment. It is not enough to have offered some facts which could support a particular theory of a case; a party must actually make an argument based on the facts. Actual mention of GICs and other insurance products in their brief or at oral argument before the district court was sparse to non-existent. Thus, we cannot say that this argument was raised in the district court, let alone "squarely."

competitors.  The only portion of the record that plaintiffs' counsel cited at oral argument in support of this new theory was an e-mail from a Fidelity lawyer, which discusses a single competitor, Galliard, and notes that Galliard is more willing to use alternative insurance products than Fidelity is.  But this e-mail says nothing about whether GICs or other insurance products would have been an appropriate substitute for wrap coverage for the MIP.  It also undermines the second premise necessary for plaintiffs' theory to succeed -- that competitors would be unable to replace wrap coverage with GICs or other insurance products -- because the e-mail specifically states that the one competitor it mentions <u>does</u> employ those products.  Thus, even if we were inclined to consider plaintiffs' new theory on appeal, it would fail due to the lack of any competent evidence supporting it.

Perhaps recognizing the logical weakness of their position, plaintiffs posit that the district court erred in determining that though there was an "accompanying benefit" to Fidelity, this benefit was not the motivator for Fidelity's decision making.  In plaintiffs' view, once the district court had found evidence of an accompanying benefit, it was required to leave to the trier of fact the decision as to whether this benefit was incidental to Fidelity or in fact motivated Fidelity's decisions.  While we question the accuracy of plaintiffs' reading of the district court decision, the simple point is that this argument

merely repackages plaintiffs' position that their belatedly proffered reading of Donovan as applied to aligned interests of the fiduciary and beneficiaries should control. Having already found that theory unpreserved, we leave it at that.

Plaintiffs offer one other claim that plausibly sounds in the duty of loyalty: that because the MIP's portfolio managers were compensated based on the degree to which performance exceeded the benchmark, they had an incentive to keep the benchmark unduly low. We can assume, for the sake of argument, that the bonus structure was in fact based on the amount by which the fund's returns exceeded the benchmark and that the benchmark was quite conservative.

We nevertheless balk at the notion that a fiduciary violates ERISA's duty of loyalty simply by picking "too conservative" a benchmark for a stable value fund. Such funds are generally presented as one of the more conservative options for investors who prefer asset preservation to the risk of pursuing greater returns. A conservative benchmark for a fund that places principal preservation as its primary goal warns the investor not to expect robust returns, and aligns expectations and results in a manner that is unlikely to harm or disappoint any investor who selects the fund.

Plaintiffs' theory also ignores basic and obvious market incentives. If Fidelity publishes a benchmark that implies no

greater safety but lower returns than those implied by the benchmarks published by competing funds, it risks losing out as plan sponsors choose what options to offer plan participants. And if Fidelity wants to increase compensation for its fund managers, there are presumably many ways to do so without setting a lower benchmark, a tactic that risks making a fund uncompetitive with those offered by other companies.

The bottom line here is that Fidelity offered an investment vehicle for conservative investors in the wake of the 2007-2008 market collapse, it published for its putative investors a cautious and unambitious benchmark, and then it consistently exceeded that benchmark. Unless we are to say that ERISA plans may not offer very conservative investment options (such as money market funds or treasury bond funds), then we cannot say that plans may not offer different types of stable value funds, including those that are intentionally and openly designed to be conservative. If informed plans or their participants do not want such funds, they will not select them over the innumerable options available.

In the end, far from inappropriately weighing evidence against plaintiffs, the district court correctly held that plaintiffs had presented no competent evidence at all to support critical elements of their theory of the breach of the duty of loyalty. Instead, plaintiffs relied on repeated speculation that

- 19 -

sophisticated investment professionals behaved in a manner that makes no sense.  As a result, summary judgment was appropriately granted on plaintiffs' loyalty claims.

**2.**

In addition to their loyalty claims, plaintiffs also pressed prudence claims in the district court.  In large part, these prudence claims are the loyalty claims dressed in prudence's clothing, and thus suffer from the same overreliance on unreasonable and unsupported speculation.  Nonetheless, because it is certainly possible for conduct to be loyal but imprudent, we address each of these claims in their own guise.

ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances . . . that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  "The test of prudence -- the Prudent [Person] Rule -- is one of <u>conduct</u>, and not a test of the result of performance of the investment. Whether a fiduciary's actions are prudent cannot be measured in hindsight."  <u>Bunch</u> v. <u>W.R. Grace & Co.</u>, 555 F.3d 1, 7 (1st Cir. 2009) (brackets, internal quotation marks, and citations omitted). Plaintiffs advance three theories of a violation of the duty of prudence:  (a) that it was imprudent to pursue wrap capacity as aggressively as Fidelity did and agree to the terms Fidelity agreed

- 20 -

to, (b) that Fidelity's use of the Barclays 1-5 G/C index as a benchmark was imprudent, and (c) that it was imprudent not to take corrective action in the face of returns that were lower than those of competitor funds.

The first contention is easily dispensed with, largely for the same reasons that the loyalty claim failed. Simply put, there is no evidence: (a) that the array of prudent options available in the relevant time period did not include aggressively pursuing wrap insurance in the context of a potential decrease in wrap providers, (b) that Fidelity took on any excess wrap insurance, and (c) that Fidelity unreasonably passed over an available better deal for its supply of wrap insurance. Absent such evidence, plaintiffs' prudence claim fails to get out of the starting blocks. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (holding that "there can be no genuine issue as to any material fact" where there is "a complete failure of proof concerning an essential element of the nonmoving party's case" (internal quotation marks omitted)). While plaintiffs make much of internal Fidelity communications describing the terms it agreed to with JP Morgan as "overly stringent," this description cannot carry the weight plaintiffs assign to it. That one party to a transaction believes the terms to be "overly stringent" proves too little unless there exists an alternative, more favorable option.

Plaintiffs' second theory fares no better.  They offer no authority, and we are aware of none, holding that a plan fiduciary's choice of benchmark, where such a benchmark is fully disclosed to participants, can be imprudent by virtue of being too conservative.  It is undisputed that the MIP's returns exceeded those of money market funds throughout the class period.  Were this case to proceed to trial, it is completely unclear by what standard a jury could find a disclosed choice of benchmark to be imprudent as "too conservative," particularly where plaintiffs make no argument that offering more conservative investments (such as money market funds) would constitute an ERISA violation.  The fact that plaintiffs on appeal criticize Fidelity for shying away from asset-backed securities in the wake of the 2007–2008 market collapse well demonstrates that plaintiffs' standard of prudence relies on hindsight.

Plaintiffs' third and final theory -- that Fidelity breached the duty of prudence by failing to take corrective action to improve the MIP's returns -- fails as well, most fundamentally for the second reason elucidated by the district court:  that plaintiffs have not identified any particular act or omission in this regard that was imprudent. See Ellis, 257 F. Supp. 3d at 131 ("Further, as Fidelity notes, the Plaintiffs do not point to any specific decision violating the duty of prudence.").  This failure is particularly important given that, as plaintiffs' own expert

admitted, the MIP's managers did consider and increase its risk allocation throughout the class period. Plaintiffs did not specify in the district court, and do not specify now, a minimum risk level below which stable value funds for some reason cannot go. Furthermore, as we have already noted, a prudence claim is evaluated from the perspective of what a fiduciary reasonably knows ex ante. See Bunch, 555 F.3d at 7. The district court was correct in finding that, at bottom, plaintiffs lacked any evidence that any of the decisions made by the MIP's managers were unreasonable under the circumstances, particularly given that Fidelity had introduced a wealth of undisputed evidence supporting the conclusion that it engaged in an evaluative process prior to making investment decisions.

We pause, finally, to address plaintiffs' repeatedly played trump card: the e-mail, discussed supra, from one of Fidelity's in-house attorneys, written in March 2010. The e-mail states, in relevant part, as follows:

> It's not one thing with Galliard, it's several. They probably are more diversified than us. They're more willing to use every tool available to them -- traditional GICs, separate account GICs, Mutual of Omaha. They're certainly more flexible than we are. You'd think given our size and our resources that we could do anything, but with us everything has to be done our way. Galliard can also afford to put deposits into cash because their crediting rates don't suck. The biggest difference between us and Galliard though is that they care about this business

- 23 -

> in a way that we don't. Stable value matters to them. We can talk all we want about how we're the best (and in some ways we are), but the fact is that while we were selling everything in the meltdown our competitors stuck to their guns. As a result, in many cases they are better off than we are. When capacity opens up (assuming it does), we might get the first call, but Galliard won't be far behind.

This e-mail has, in one way or another, anchored most of plaintiffs' arguments throughout this case. Admittedly, it uses colorful language, and surely -- as plaintiffs argue -- most investors would not want to invest in a fund whose crediting rates "suck." But this e-mail tells us much too little about whether Fidelity breached its duties under ERISA. Rather, it shows a Fidelity employee looking back in hindsight and noting that Fidelity underperformed many competitors based on choices made in response to the financial crisis. One can only imagine the mirror-image e-mails of regret Fidelity's competitors would have written had the markets collapsed instead of rebounding. And as we have made clear, hindsight regret cannot be the basis for an ERISA claim. See id.

Because plaintiffs failed to adduce evidence sufficient to proceed to trial on any of their theories of prudence, the district court was correct to reject plaintiffs' prudence claims.

## III.

Though the record in this matter is voluminous, the essential issues are relatively straightforward. Plaintiffs failed to adduce evidence after ample discovery that would have provided reasonable, non-speculative support for their claims of disloyalty or imprudence. The record shows, instead, an alignment between the interests of Fidelity and the MIP participants, and an investment strategy that lacked not prudence, but rather, a crystal ball. The district court's grant of summary judgment is affirmed.