# United States Court of Appeals
## For the First Circuit

No. 17-1515

MARY BARCHOCK; THOMAS WASECKO; STACY WELLER,

Plaintiffs, Appellants,

v.

CVS HEALTH CORPORATION; THE BENEFITS PLAN COMMITTEE OF CVS
HEALTH CORPORATION; GALLIARD CAPITAL MANAGEMENT, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Jason H. Kim, with whom Todd M. Schneider, Schneider Wallace
Cottrell Konecky Wotkyns LLP, Sonja L. Deyoe, and Law Offices of
Sonja L. Deyoe were on brief, for appellants.
Meaghan VerGow, with whom Brian D. Boyle, Bradley N. García,
O'Melveny & Myers LLP, Robert Clark Corrente, Whelan, Corrente,
Flanders, Kinder & Siket LLP, Joel S. Feldman, Mark B. Blocker,
Robert N. Hochman, Daniel R. Thies, and Sidley Austin LLP were on
brief, for appellees.
Evan A. Young, Shane Pennington, Baker Botts LLP, Steven P.
Lehotsky, Janet Galeria, U.S. Chamber Litigation Center, and Janet
M. Jacobson, on brief for amici curiae Chamber of Commerce of the
United States of America and American Benefits Council.
Brian D. Netter, Nancy G. Ross, Mayer Brown LLP, and Kevin
Carroll, on brief for amicus curiae Securities Industry and
Financial Markets Association.

March 23, 2018

BARRON, **Circuit Judge**.  The plaintiffs allege violations of the fiduciary duty of prudence under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, by the fiduciaries of an employer-sponsored retirement plan.  Specifically, the plaintiffs contend that a particular investment fund offered through the plan was invested too heavily in cash or cash-equivalents for the years at issue and thus that the plan was imprudently managed and monitored.  The District Court dismissed the complaint for failure to state a claim under ERISA.  We affirm.

## I.

To understand the sole issue on appeal, it helps to provide some background concerning the duty of prudence that ERISA establishes.  We then describe the particular allegations that the plaintiffs offer in support of the imprudence claims that they bring and the travel of the case.  Finally, we briefly review the rulings below.

## A.

ERISA provides that any person who exercises discretionary authority or control in the management or administration of an ERISA plan (or who is compensated in exchange for investment advice) is a fiduciary.  29 U.S.C. § 1002(21)(A).  ERISA further provides that such a fiduciary has a duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B).

Importantly, the Supreme Court has explained that "the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts." Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2471 (2014) (omission in original) (quoting 29 U.S.C. § 1104(a)(1)(B)). Accordingly, with respect to whether a complaint states a claim of imprudence under ERISA, "the appropriate inquiry will necessarily be context specific." Id.

As we explained in Bunch v. W.R. Grace & Co., 555 F.3d 1 (1st Cir. 2009), in connection with a claim of imprudence concerning an ERISA plan's investments, "[t]he test of prudence -- the Prudent Man Rule -- is one of conduct, and not a test of the result of performance of the investment." Id. at 7 (quoting Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983)). Moreover, we explained that "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight." Id. (quoting DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 424 (4th Cir. 2007)).

**B.**

In 2016, the plaintiffs -- Mary Barchock, Thomas Wasecko, and Stacy Weller -- filed this suit in the United States District Court for the District of Rhode Island. They did so

pursuant to 29 U.S.C. § 1132(a), which authorizes any ERISA plan participant to bring a civil action against an ERISA fiduciary liable under 29 U.S.C. § 1109 for breach of its duties.

According to the complaint, the three plaintiffs participated from 2010 to 2013 in an ERISA employee retirement plan that was sponsored by their employer, CVS Health Corporation ("CVS"), and administered by the Benefits Plan Committee of CVS.[1] The plan was a 401(k) defined contribution plan that offered several investment options to participants, including what is known as a "stable value fund." The Benefits Plan Committee appointed Galliard Capital Management, Inc. ("Galliard") to manage that fund.

All three plaintiffs allocated portions of their retirement investments under the plan to this stable value fund, which held approximately $1 billion in assets. Their complaint alleged that CVS, the Benefits Plan Committee, and Galliard owed the plaintiffs a fiduciary duty of prudence under ERISA with respect to the plan's investments in the fund and that each of the defendants breached that duty.

In so claiming, the plaintiffs' complaint described what a stable value fund is by quoting the description of such funds

---

[1] The undisputed facts are drawn from the complaint and documents incorporated by it. See Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008).

given by the Seventh Circuit in Abbott v. Lockheed Martin Corp., 725 F.3d 803 (7th Cir. 2013). Specifically, the complaint quoted Abbott as describing stable value funds, or SVFs, as "recognized investment vehicles" that

> typically invest in a mix of short- and intermediate-term securities, such as Treasury securities, corporate bonds, and mortgage-backed securities. Because they hold longer-duration instruments, SVFs generally outperform money market funds, which invest exclusively in short-term securities. To provide the stability advertised in the name, SVFs are provided through "wrap" contracts with banks or insurance companies that guarantee the fund's principal and shield it from interest-rate volatility.

Id. at 806 (citations omitted).

The complaint did not identify what information was provided by the defendants to plan participants before they invested in the CVS stable value fund. Notably, the complaint did not allege that the plan documents specified how the fund's assets would be allocated. The complaint did, however, allege that the fund was part of a mix of investment options that the employer offered in "lifestyle" funds described as "conservative" and "moderate," as opposed to "aggressive." The complaint also alleged that, according to the plan's Internal Revenue Service Form 5500 Annual Return from one of the years at issue, the fund's stated objective was "to preserve capital while generating a steady rate

- 6 -

of return higher than money market funds provide" (emphasis omitted).

With respect to Galliard, the complaint contended that, as a fiduciary, it breached its duty of prudence under ERISA in managing the CVS stable value fund by investing "too much" of the fund's assets in short-term debt obligations equivalent to cash, as opposed to intermediate-term investments that generally provide higher returns. Specifically, the complaint alleged that from 2010 to 2013, Galliard invested between twenty-seven and fifty-five percent of the fund's assets in an investment fund offered by a different firm that was invested "primarily" in such cash equivalents. (Galliard allocated the balance of the CVS stable value fund to intermediate-term investments.) This asset allocation, according to the complaint, predictably both resulted in unnecessary liquidity and "acted as an enormous drag on the duration of the overall Stable Value Fund portfolio, which depressed returns."

The complaint further alleged that this asset allocation was a "severe outlier" when compared to allocation averages for the stable value industry.[2] And, to identify those averages, the

_____

[2] In addition, the complaint made a related allegation that Galliard's parent company managed a different stable value fund that, between 2010 and 2013, invested all of its assets in yet another fund that, in turn, invested less than ten percent of the fund in "interest-bearing cash or cash equivalents." The complaint then purported to infer from these allegations that "Galliard well

- 7 -

complaint incorporated a survey of industry data from 2011 and 2012.[3] That survey was released by the Stable Value Investment Association, which the complaint described as a trade association for the stable value industry. The complaint alleged that, according to the survey, the average mean allocation of assets to cash or cash-equivalent investments by stable value funds surveyed was between only five and ten percent for the years 2011 and 2012.[4]

Finally, the complaint alleged that Galliard's relatively high allocation of investments in short-term, cash-equivalents was at odds with "well-established principles of stable value investing." The complaint explained that investors in stable value funds generally agree to contractual provisions that restrict the liquidity of their investments in exchange for relatively stable returns from longer-term investments. Yet, the

---

understood . . . that it was not necessary to maintain such a large percentage of cash or cash equivalents in a stable value fund." However, the plaintiffs have abandoned this argument on appeal.

[3] The complaint stated that the survey was attached as an exhibit, although it appears not to have actually been attached. However, the defendants subsequently filed the survey in the District Court as an exhibit attached to a declaration by one of their attorneys, and the plaintiffs did not oppose that filing.

[4] The complaint also alleged that, due to the CVS stable value fund's relatively high investment in cash equivalents, the "average duration of [the fund's] investments" (presumably excluding its pure cash holdings) between 2010 and 2012 was approximately one year, whereas the average duration of investments by stable value funds participating in the survey during 2011 and 2012 was approximately three years.

complaint alleged, Galliard's excessive allocation of the CVS stable value fund's assets to short-term, cash-equivalent investments resulted in liquidity that the investors did not want and for which the plaintiffs paid a premium by losing out on the higher returns generally associated with longer-term investments. And, the complaint asserted, that allocation decision cannot be justified in terms of reducing risk because stable value funds, as conventionally structured, have historically outperformed money market funds -- which invest in cash equivalents -- in terms of both return and volatility. To support that last proposition, the complaint cited an academic study from 2007 and an updated version of that study from 2011. See David F. Babbel & Miguel A. Herce, A Closer Look at Stable Value Funds Performance (Wharton Financial Institutions Center Working Paper No. 07-21, 2007); David F. Babbel & Miguel A. Herce, Stable Value Funds: Performance to Date (Wharton Financial Institutions Center Working Paper No. 11-01, 2011).

As for the other two defendants -- CVS and the Benefits Plan Committee -- the complaint alleged that they had breached their duty of prudence by inadequately monitoring Galliard. The complaint asserted that, had they been prudent, they "would have immediately discovered that the reason for the [CVS stable value fund's] poor performance was because an unreasonably high percentage of the . . . assets were invested in cash-equivalent accounts that produced abysmal investment returns and that this

allocation strategy was highly anomalous by industry standards." Yet, the complaint alleged, neither CVS defendant "took any action" to change Galliard's investment strategy.

The plaintiffs sought declaratory and injunctive relief, as well as reimbursement for losses from reduced investment return, damages, and attorney's fees. The plaintiffs also requested class certification on behalf of all participants in the CVS retirement plan who invested in the plan's stable value fund.

The defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim under ERISA. The defendants did not dispute that they were ERISA fiduciaries. However, they contended that the complaint did not state a claim that was cognizable under ERISA because the allegation that Galliard allocated a relatively high proportion of the fund's assets to short-term, cash-equivalent investments could not alone support a claim of imprudence. The defendants also contended that, to the extent that the complaint was simply alleging that Galliard should have taken more risk with the fund's investments in order to achieve higher returns, the plaintiffs were merely criticizing the performance of the fund with the benefit of hindsight and that such second-guessing could not support a claim under ERISA for breach of the duty of prudence. Finally, the defendants contended that the failure to state a claim against Galliard necessarily meant that the complaint failed to

state a claim against the CVS defendants for imprudently monitoring Galliard.

## C.

The District Court assigned the case to a Magistrate Judge. The Magistrate Judge recommended dismissing the complaint on the grounds specified by the defendants. The District Court agreed, and it dismissed the complaint and entered judgment in favor of the defendants.

The District Court reasoned that the plaintiffs' claims were not focused on the prudence of the decisions that Galliard made when evaluated in light of the circumstances prevailing at the time that Galliard made those decisions. Rather, in the District Court's view, the plaintiffs were merely alleging that, if the fund's investments in cash-equivalents had instead been invested in the same manner as the fund's other assets, then the fund would have earned higher returns. The District Court therefore determined that the complaint failed to state a claim under ERISA, as the claim did not even purport to account for the specific context in which the challenged investment decisions were made and instead focused only on how poorly those decisions turned out. In short, the District Court concluded, the complaint was making an impermissible "hindsight" critique of Galliard's management of the fund.

The plaintiffs then filed this appeal challenging the District Court's dismissal of the complaint under Rule 12(b)(6) for failure to state a claim. Our review is de novo. SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc). We take the complaint's well-pleaded facts as true, and we draw all reasonable inferences in the plaintiffs' favor. Id. Well-pleaded facts must be "non-conclusory" and "non-speculative." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). As part of our review, we may consider "implications from documents attached to or fairly incorporated into the complaint." Id. (internal quotation marks omitted) (quoting Arturet-Vélez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005)). To survive dismissal, however, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Tambone, 597 F.3d at 437 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

## II.

With respect to the claim of imprudence against Galliard, the plaintiffs insist that, contrary to the ruling below, their complaint's allegation of imprudent investment is not based

merely on the fact that the CVS stable value fund turned out to have performed poorly. For that reason, the plaintiffs insist their imprudence claim against Galliard is "not based on mere hindsight criticism" of its investment strategy.

In pressing this contention, the plaintiffs appear to be asserting that, with respect to ERISA's requirement that a fiduciary exercise the prudence that "a prudent man" would use "in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), the management of a fund labeled as a stable value fund constitutes the relevant "enterprise" of comparison. From that implicit premise,[5] the plaintiffs then contend that Galliard -- by allocating twenty-seven to fifty-five percent of the CVS stable value fund's assets to an investment fund primarily holding short-term, cash-equivalent investments -- "departed radically" from the investment standards and logic

_____

[5] Given that the plaintiffs are not bringing a misrepresentation claim, it is not clear why the relevant comparative enterprise under ERISA here should be the management of funds labeled as stable value funds, as opposed to a more general or a more specific category of retirement funds. After all, the CVS fund stated its investment objective in more general terms, while the funds that participated in the stable value fund survey incorporated in the plaintiffs' complaint were not all similarly structured, as some were "individually managed single-plan accounts," others were "bank and investment company commingled pooled funds," and still others were "life insurance company accounts attached to full service products." But, rather than affirmatively argue that, for purposes of evaluating whether Galliard's investment strategy was an imprudent one, the proper "enterprise" is the management of a fund labeled as a stable value fund, the plaintiffs just assert that it is the proper one to use.

then prevailing for the management of such funds. And, in the plaintiffs' view, we can reasonably infer that Galliard imprudently invested the fund's assets solely from the fact that Galliard's "cash"-focused strategy "departed radically" from the practices and logic guiding the management of such funds. Thus, the plaintiffs contend, they did not need to allege anything more about the specific context in which Galliard made particular investment decisions in order to state a claim of imprudence.

The defendants counter that the plaintiffs have failed to state a plausible claim of imprudent investment management against Galliard under ERISA for the following reasons. The defendants point out that the complaint itself alleges that CVS offered the stable value fund as part of its more conservative retirement plan options and that the fund's stated objective was "to preserve capital while generating a steady rate of return higher than money market funds provide." And, the defendants contend, it is clear from the face of the complaint that Galliard then fulfilled that conservative investment objective that had been disclosed to the plan participants.

In addition, the defendants note, the plaintiffs "do not directly criticize the process by which the Fund's investment allocation was selected in pursuit of that objective." In that regard, the defendants point out that the plaintiffs have abandoned their complaint's assertion that Galliard was a sleeping manager

who took a "fire-and-forget" approach to asset allocation, in light of the complaint's contrary allegations that Galliard actively managed the CVS stable value fund. Nor, the defendants point out, have the plaintiffs "suggested that defendants had something to gain from managing the fund conservatively," which could raise doubts about the prudence of Galliard's investment process.

As a result, the defendants contend that the mere fact that the complaint alleges that Galliard pursued a relatively more "cash"-focused investment strategy than most funds that participated in the industry survey that the complaint incorporates is insufficient to state a claim of imprudence. In their view, such a complaint necessarily fails to provide the kind of context for evaluating Galliard's investment choices that Fifth Third Bancorp and Bunch demand.

The plaintiffs do not dispute the defendants' characterization of what their complaint does and does not allege. Thus, they do not dispute that Galliard met the CVS stable value fund's stated objective of preserving capital while outperforming money market funds, which are, as indicated above, "cash"-based. In addition, the plaintiffs clarified at oral argument that they are not arguing that offering money market funds as a retirement plan would in and of itself be a breach of the duty of prudence under ERISA. Nor, the plaintiffs also clarified at oral argument, is their theory that the defendants should be liable for

misrepresenting the investment vehicle in which the plaintiffs invested as a stable value fund when it was, in the plaintiffs' view, managed more like a money market fund.

Thus, on the plaintiffs' own account, we are left with the following allegation. Given what the plaintiffs contend was then-prevailing stable value management practice and logic, Galliard was imprudent in managing the CVS stable value fund, despite meeting the fund's stated investment objective of outperforming money market funds, solely because the CVS fund was managed "too much" like a money market fund. And we are left with that allegation even though, on the plaintiffs' theory, a money market fund itself is a prudent retirement investment vehicle to offer and the CVS fund was not misrepresented to plan participants as something that it was not.

We have -- just recently -- rejected a claim that an ERISA fiduciary imprudently managed a stable value fund by, among other things, establishing too conservative of a benchmark (despite disclosing and then exceeding that benchmark) and not investing in higher-risk, higher-return instruments. Ellis v. Fidelity Mgmt. Tr. Co., No. 17-1693, 2018 WL 991515, at *6-8 (1st Cir. Feb. 21, 2018). And, in doing so, we indicated that conservativism in the management of a stable value fund -- when consistent with the fund's objectives disclosed to the plan participants -- is no vice. "Were this case to proceed to trial,"

- 16 -

we observed in Ellis, "it is completely unclear by what standard a jury could find a disclosed choice of benchmark to be imprudent as 'too conservative,' particularly where plaintiffs make no argument that offering more conservative investments (such as money market funds) would constitute an ERISA violation." Id. at *7. In this regard, we explained elsewhere in the opinion, "[u]nless we are to say that ERISA plans may not offer very conservative investment options (such as money market funds or treasury bond funds), then we cannot say that plans may not offer different types of stable value funds, including those that are intentionally and openly designed to be conservative." Id. at *6.

Our analysis in Ellis clearly casts doubt on the viability of the plaintiffs' imprudence claim here. But, we have not previously had occasion to address whether the allegation here that an ERISA fiduciary "departed radically" from the practices and financial logic of like funds could -- on its own -- provide a standard for how conservative is "too conservative" and thus suffice to state a claim of imprudence under ERISA. And the plaintiffs contend that such an allegation can suffice both because a substantial body of out-of-circuit precedent supports that conclusion and because the logic of the statutory provision that imposes the duty of prudence does as well. And so we now consider each of those arguments.

We begin with the plaintiffs' contention that out-of-circuit precedent supports their position. But, as we will explain, none of the cases on which the plaintiffs rely passed on the question presented here: whether allegations that a stable value fund invested a relatively high proportion of its assets in cash or cash-equivalents, and that such a "cash" allocation departed radically from the logic and practices of such funds, suffice in combination to state a claim of imprudence under ERISA.

Several of the cases cited by the plaintiffs hold merely that alleged differences between a challenged fund's performance or characteristics and those of comparable funds suffice to state a claim of imprudence under ERISA where a flaw in the fiduciary's decision-making process could be reasonably inferred from allegations of self-dealing.[6] The plaintiffs also cite cases

---

[6] See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595-96 (8th Cir. 2009) (allegation that ERISA fiduciary invested in funds with higher management fees as "a quid pro quo" in return for kickbacks); Krueger v. Ameriprise Fin., Inc., No. 11-02781, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) (allegation that ERISA fiduciary invested in its own affiliated funds that charged higher management fees because doing so generated additional profits for the fiduciary). The only other case to which the plaintiffs point in which an imprudence claim was allowed to go forward at the motion-to-dismiss stage included allegations, not present in our case, that ERISA fiduciaries selected a "relatively new, expensive, underperforming investment option" because the funds in which they invested were managed by a firm affiliated with the retirement plan's record-keeper and trustee, that these funds charged higher management fees than comparable funds, and that the funds "had no meaningful record of performance so as to

-- involving rulings after bench trials, rather than at the motion-to-dismiss stage -- in which findings of imprudence under ERISA did not rest on allegations of self-dealing. But, in each of those cases, the finding that an ERISA fiduciary had violated the duty of prudence rested on evidence that, in managing investments for ERISA plan participants, the fiduciary took on more risk than the fiduciary had disclosed to the participants.[7]

Finally, the plaintiffs also rely on an unreported district court decision in the Abbott litigation, which is the same litigation that produced the Seventh Circuit's decision permitting class certification, 725 F.3d 803, from which the plaintiffs' complaint quotes in order to describe what stable value funds are. In that litigation, the district court denied the defendants' motion for summary judgment with respect to a claim that the manager of a stable value fund breached its duty of

indicate that higher performance would offset this difference in fees." Lorenz v. Safeway, Inc., 241 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017).

[7] See Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1045 (9th Cir. 2001) (overinvestment in collateralized mortgage obligations was imprudent, "given evidence that [collateralized mortgage obligations] could be highly risky investments" and "that the [ERISA-governed trust fund] had very conservative investment guidelines"); Prudential Ret. Ins. & Annuity Co. v. State St. Bank & Tr. Co. (In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.), 842 F. Supp. 2d 614, 646 (S.D.N.Y. 2012) ("enhanced index funds" were imprudently managed to accept twice as much risk than disclosed to investment adviser for ERISA retirement plans that had invested in those funds).

prudent investment under ERISA. Abbott v. Lockheed Martin Corp., No. 06-0701, 2009 WL 839099, at *9-11 (S.D. Ill. Mar. 31, 2009).

The plaintiffs here contend that their imprudence claim "fit[s] squarely within the claims and rulings in Abbott." In particular, the plaintiffs represent that the "fundamental allegation" in Abbott was that the fund was imprudently invested in short-term, cash-equivalent investments because between fifty and ninety-nine percent of the fund's assets were invested in cash-equivalents. See id. at *9. Thus, the plaintiffs contend that the district court's summary judgment decision in Abbott supports their contention that their complaint has stated an imprudence claim against Galliard by alleging that Galliard invested between twenty-seven and fifty-five percent of the CVS stable value fund's assets in an investment fund that was primarily invested in cash-equivalents.

However, we do not see how the district court's summary judgment ruling in Abbott shows that the imprudence claim that the plaintiffs bring here is cognizable. To be sure, at oral argument, the defendants were willing to assume that it might be possible to infer imprudent stable value management from an extreme allocation of assets to cash or cash-equivalents -- perhaps, in their counsel's words, if "nearly 100 percent" of a fund's assets are so allocated, like the alleged ninety-nine percent cash-equivalent allocation in Abbott. But, as the defendants point out, the high

end of the alleged cash-equivalent allocation of the stable value fund in Abbott was much higher than that of the CVS stable value fund here.[8]  And, more importantly, it is clear from the district court's summary judgment ruling that the plaintiffs in Abbott did not allege that the fund there was imprudently managed solely because a relatively high proportion of the fund's assets were invested in cash-equivalents.  See id. at *9-11.

Thus, the precedents on which the plaintiffs rely do not help their cause.  Those precedents simply did not have occasion to pass on a theory akin to that of the plaintiffs -- namely, that imprudence can be inferred solely from their complaint's charge that Galliard's cash-equivalent allocation "departed radically" from both industry averages and the underlying financial logic of stable value management.

**B.**

In evaluating whether the plaintiffs' novel theory nonetheless has force, it is important to keep in mind that the complaint does not allege anything about the particular circumstances that Galliard faced in managing the fund beyond the facts that there was a financial crisis in 2008 during which money

---

[8] In fact, the complaint does not actually allege what the precise cash-equivalent allocation here was.  The complaint alleges merely that twenty-seven to fifty-five percent of the CVS stable value fund's assets -- depending on the year at issue -- were allocated to a separate investment fund that was, in turn, invested "primarily" in cash equivalents.

market yields declined and that the fund's stated objective was "to preserve capital while generating a steady rate of return higher than money market funds provide." To supply the required context for the plaintiffs' imprudence claim, the complaint instead relies on the extent to which Galliard's cash-equivalent allocations deviated from allocation averages in the stable value industry as well as from what the plaintiffs contend is the inherent logic of stable value funds.

A claim resting on such evidence, however, runs into the concern that we recently set forth in Ellis. For it is hard to see how the fact that a stable value fund was run conservatively indicates that it was being run imprudently, where "plaintiffs make no argument that offering more conservative investments (such as money market funds) would constitute an ERISA violation." Ellis, 2018 WL 991515, at *7. We see no daylight between the prudence claim rejected in Ellis and that presented here. Even if we grant plaintiffs' premise and assume that evidence showing a "radical[]" deviation from standard stable value management practice could on its own supply the necessary context to state a claim of imprudence, we do not see how the evidence that the plaintiffs have put forward on that score could suffice.

The plaintiffs emphasize the data contained in the industry survey that their complaint incorporates. But, that survey sets forth the arithmetic mean of cash-equivalent

- 22 -

allocations by all of the stable value funds participating in the survey for each year. Neither the survey nor the complaint reveals the distribution of cash-equivalent allocations by the funds participating in the survey that results in the industry-wide arithmetic means that the survey sets forth. And, without such distribution information, it is unreasonable to infer solely from the complaint's allegation that Galliard "departed radically" from the annual arithmetic means of cash-equivalent allocations by like funds that Galliard was a "severe outlier" from all other such funds when it came to asset allocation decisions -- at least given the large number of stable value funds that existed.[9]

In fact, the industry survey incorporated by the complaint indicates that the cash-equivalent allocations in the surveyed funds ranged widely -- from 0.3 to 36.5 percent in 2011

---

[9] The large number of stable value funds is apparent from the complaint. The industry survey incorporated by the complaint indicates that forty-three firms participated in the survey, with over $700 billion in combined stable value assets under management. It appears, however, that those forty-three firms managed assets held by many different defined contribution retirement plans. The survey itself does not say how many plans were covered or what the variation in the asset allocations of their stable value fund investments was. But, in this regard, the academic study of stable value funds on which the complaint relies indicates that there were over $800 billion invested in stable value funds through almost half of all defined contribution plans. Babbel & Herce, Stable Value Funds: Performance to Date, 1. And the study states that $561 billion of those assets were held by as many as 173,050 plans. Id. at 1 n.4.

and from 0.44 percent to 48.2 percent in 2012.[10] And the complaint alleges that the CVS stable value fund's allocation to a fund primarily invested in cash-equivalents was 44 percent in 2011 and 48 percent in 2012. That means, with respect to the two years for which the survey provides data, that the CVS stable value fund's cash-equivalent allocation was potentially outside the range of allocations made by the surveyed funds in 2011 but then was necessarily <u>within</u> the range of allocations made by the surveyed funds in 2012.

In the absence of any additional context, these survey statistics thus show merely that Galliard charted a relatively more "cash"-focused course than most of the funds that were surveyed, while taking the most "cash"-focused course in one year but not in the next year. But, consistent with our reasoning in <u>Ellis</u>, we do not see how those facts alone can suffice to support a plausible claim that such decision-making was imprudent.

Given the paucity of allegations that the complaint makes about the circumstances facing the CVS stable value fund at the time, it would be pure speculation to infer that Galliard did

---

[10] The defendants suggest that the low end of the range was never below two percent. Their estimation of the range apparently excludes the survey's data from stable value funds offered by life insurance companies that commingled the assets of unrelated retirement plans. We instead consider the range that is most favorable to the plaintiffs, but the difference ultimately has no bearing on our analysis.

not have a good reason to make those "cash"-heavy decisions.[11] After all, we see no reason to accept the plaintiffs' implicit assertion that, in managing a stable value fund, a decision to take the path less traveled is for that reason imprudent.

To be sure, the complaint does allege that Galliard's management of the CVS stable value fund was imprudent in 2010 and 2013 as well. But the survey incorporated by the complaint does not even encompass those years, and the complaint contains no data about how other funds in the industry allocated their investments in either of those years. Thus, the complaint does not provide any direct allegation that the CVS fund was unique in being invested so substantially in cash-equivalents in 2010, the sole year when its cash-equivalent allocation reached potentially as high as fifty-five percent, or 2013, when its cash-equivalent allocation was no more than twenty-seven percent.

Nor does the complaint allege that stable value funds' average asset allocations in the years not covered by the survey (2010 and 2013) were similar to the industry average allocations for the intervening years (2011 and 2012) that the survey does cover. And, in any event, the CVS fund's potential cash-equivalent

---

[11] It is true that the complaint alleges that money market yields declined during the crisis. But that additional allegation, without any additional context, does not make it plausible that a decision to increase money market investments immediately following the crisis was imprudent, even if in hindsight it proved to have been relatively costly.

allocation in 2013 (twenty-seven percent) was <u>well within</u> the range for each year that the survey covers.

Moreover, 2010, which is when Galliard's "cash" allocation was at its height, was the year closest to the "2008 financial crisis" referenced in the complaint. That fact may or not make stable value funds' asset allocations in 2010 distinct from subsequent years. But, in light of the allegations in the complaint, it would be pure speculation to infer that average industry allocations in that year -- for which the complaint provides no survey data -- would have been no different from the averages derived from the survey data for the subsequent years. <u>See, e.g.</u>, <u>Ellis</u>, 2018 WL 991515, at *6-8 (granting summary judgment against a claim that an ERISA fiduciary was imprudent "[i]n the wake of the 2007-2008 financial crisis" by allocating a stable value fund's assets "away from higher-return, but higher-risk sectors . . . and toward treasuries and other cash-like or shorter duration investments," <u>id.</u> at *2).

Given the evident problem with resting a claim of imprudence solely on these survey data, the plaintiffs' claim needs to rest on something more in order to be plausible. The plaintiffs contend that the complaint contains that "something more" because it alleges that the "underlying financial logic" of stable value funds renders reasonable an inference that Galliard's relatively

- 26 -

more money-market-fund-like choices (as the survey data reveal them to have been) were not just cautious but imprudent.

The complaint alleges in this regard that stable value funds have historically outperformed money market funds without increased volatility. And the complaint relies for that allegation on an academic study whose results, at least in part, were available at the time of Galliard's investment decisions.[12] The plaintiffs then argue that the study suggests that investing in the types of short-term debt obligations that compose money market funds is imprudent if an alternative option to invest in longer-term investments is available and -- as the complaint alleges was true of stable value fund investors -- anticipated liquidity needs are reduced.

The academic study on which the plaintiffs rely, however, does not itself suggest that a stable value fund should refrain from holding any particular proportion of its assets in cash or cash equivalents, such that imprudence could be inferred from Galliard's allocations. Rather, with respect to the composition of stable value funds, the study states only that they

---

[12] As the complaint points out, the updated version of the 2007 study, which was released in 2011, indicated that this trend generally continued during the financial crisis preceding Galliard's decisions. However, that version of the study was not available at the time that Galliard decided to allocate fifty-five percent of the CVS stable value fund during 2010 to an investment fund primarily holding cash-equivalents.

are "typically comprised of high quality, short maturity (usually well under five years) corporate and government bonds, mortgage-backed securities, and asset-backed securities," without addressing the extent to which they might also hold cash or cash-equivalents. Babbel & Herce, Stable Value Funds: Performance to Date, 3. And the study then simply makes a retrospective claim that stable value funds, however their assets happened to have been constituted in the past, have historically outperformed money market funds. Id. at 16.

Moreover, at oral argument, the plaintiffs' counsel emphasized that their theory is not that any investment in cash equivalents by an ERISA fiduciary is by itself a breach of the duty of prudence. Thus, the argument that the plaintiffs necessarily must press is that the underlying financial logic of stable value funds dictates not that any investment in cash or cash equivalents is imprudent but rather that the specific cash-equivalent allocation here was.

The plaintiffs, however, have failed to offer a theory for determining, based on the underlying financial logic of stable value funds, how much liquidity is "too much," such that imprudence may be reasonably inferred. And they certainly do not offer a theory that would make plausible the notion that the cash-equivalent allocations of a fund labeled as a stable value fund are imprudent simply because those allocations are consistently

larger for a certain number of years than the mean allocations of five to ten percent derived from all funds (whatever their particularities) participating in a survey conducted by a trade association for the stable value industry.

After all, the plaintiffs have not explained why financial logic makes it plausible to conclude -- without knowing anything more about the particular circumstances affecting an ERISA fiduciary's choices regarding asset allocations -- that what the plaintiffs call a five to ten percent "cash buffer" is prudent, but that a buffer closer to twenty-seven to fifty-five percent "cash" is not. Rather, as far as the complaint reveals, the plaintiffs' only basis for setting the maximum threshold for a prudent "cash buffer" at ten percent is the allegation that the annual arithmetic means of the surveyed funds' cash-equivalent allocations were no higher than ten percent. The plaintiffs themselves acknowledge, however, that they need to point to something more than merely that the CVS fund's cash-equivalent allocations were higher than those means in order to state a claim of imprudence under ERISA. Otherwise, in the plaintiffs' words, we are left with "just cavils about deviation from industry standards."

## III.

That still leaves the question whether the complaint nevertheless states a claim against the CVS defendants for

imprudently monitoring Galliard. However, the complaint alleges no harm other than the stable value fund's underperformance as a result of Galliard's alleged misallocation of the fund's assets. Because of our determination that this alleged harm is not cognizable under ERISA, there remains no basis for supporting a claim against the CVS defendants. Accordingly, we conclude that the complaint also fails to state a plausible claim against the CVS defendants.

## IV.

For these reasons, the judgment of the District Court is **affirmed**.